203 So.2d 363 (1967)
WESTWOOD LAKE, INC., a Florida Corporation, Appellant,
v.
METROPOLITAN DADE COUNTY WATER AND SEWER BOARD, a Governmental Agency of Metropolitan Dade County, Florida, Appellee.
No. 66-839.
District Court of Appeal of Florida. Third District.
October 3, 1967.
Rehearing Denied November 3, 1967.
*364 Patton & Kanner, Miami, for appellant.
Thomas C. Britton, County Atty., and Louis Schneiderman, Asst. County Atty., for appellee.
*365 Before CHARLES CARROLL, C.J., and HENDRY and SWANN, JJ.
SWANN, Judge.
This appeal stems from an order on rates issued by the Metropolitan Dade County Water and Sewer Board, which affected Westwood Lake, Inc., a utility company.
Appellant, Westwood Lake, Inc., is a Florida corporation, composed of two divisions; one constructs and sells homes, the other operates a water and sewer plant. It filed a single income tax return for both divisions of the company and did not keep separate accounts for the two divisions until about 1964.
A petition for certiorari from the Board's order on rates was taken by the utility to the Circuit Court of Dade County, Florida. See Section 32-23, Metropolitan Dade County Code. The Circuit Court entered an order denying the petition for certiorari and Westwood Lake, Inc. has taken this appeal.
Under these circumstances, we are concerned only as to whether the Circuit Court applied the applicable law and acted in accordance with established procedure. Ammerman v. Florida Board of Pharmacy, Fla.App. 1965, 174 So.2d 425. Unfortunately, the appellant and the appellee have not agreed, in their briefs, on the appropriate and determinative points for consideration by this court, inasmuch as the appellant submits four points for review and the appellee contends that there are no less than fourteen separate points. Since the appellee has not filed any cross-assignments of error, we will attempt to discuss only those points raised by the appellant.
The appellant argues that there is no substantial competent evidence in the record to support the findings of the Board in the entry of the order which fixed its rate of return at six per cent on its rate base of $975,614; reduced the compensation paid to its executives from $18,000, as requested by the utility, to $12,000, as ordered by the Board; excluded from its rate base the sum of $5,000 in self-insurance reserves; excluded from its rate base the sum of $18,000 as expenses incurred in this rate case; held that the sum of $1,624,757 was a contribution which should be excluded from the rate base; and further, that there was a departure from the essential requirements of law when the Board required the utility to initially carry the burden of proof to show that its then existing rates were unreasonable.
The attorney for the Board admitted at the hearings that the Board had the initial burden of proof but suggested that the attorney for the utility go forward with the case. The attorney for the utility agreed that it had no objection to "the burden of proceeding forward first," and agreed also that where the Board was seeking a rate change the burden of proof was on it.
It has recently been held that the initial burden of proof to establish the unreasonableness of rates was on the Board in a case of this type. See Metropolitan Dade Co. W. & S. Bd. v. Community U. Corp., Fla.App. 1967, 200 So.2d 831; In re Coal Rates in New Mexico, 23 N.M. 704, 171 P. 506 (1918). See also Welch, Conduct of the Utility Rate Case, 203 (1955). We proceed therefore to an examination of whether the Board met its proper burden of proof on the various items, and whether the applicable law has been applied.
A review of the record herein establishes that there was no substantial competent evidence in the record to support the order reducing the total salaries of the executives of the utility from $18,000 to $12,000. The only evidence presented by the Board was that of a staff witness, A.H. Blake, Jr., who testified that, in his opinion, executive compensation for rate making purposes should not exceed $12,000. This opinion was concurred in by another staff witness, W. Wirt Culbertson. This was insufficient to sustain the Board's ruling and *366 was therefore a departure form the essential requirements of the law. See also Re Siren Teleph. Co., Inc., 30 PUR 3d 336 (Wis. Pub.Serv.Com. 1959); Re Ripley Water Supply Co., 74 PUR (NS) 446 (N.Y. Dep.Pub.Serv. 1948); Villages of Milford v. Illinois Commerce Comm., 20 Ill.2d 556, 170 N.E.2d 576 (1960); Re Valley Water Co., 79 PUR (NS) 88 (Mont. Pub.Serv. Com. 1949).
The order of the Board indicated that the utility planned to establish a self-insurance reserve of $55,000 to be funded at the rate of $5,000 per year. This was to be in addition to the existing fire extended coverage and vandalism insurance coverage of approximately $500,000; product liability coverage of $500,000, and automobile liability coverage of $1,000,000, on which insurance coverage the premiums had been allowed by the Board as an operating expense. The Board submitted testimony from the Dade County Insurance Manager that the facilities of the utility were not a proper subject for self-insurance because of the fact that through lack of geographical dispersion all of its property was exposed to the same risk. The Board indicated that it would be disposed to allow additional operating expenses for insurance, provided that such insurance be handled by an insurance company through the payment of insurance premiums, because the self-insurance program was determined to be unreasonable under the circumstances. The utility presented no evidence to show the nature and probability of the risk against which it requires a self-insurance fund. Its experience appears to indicate no necessity for any increase in its insurance coverage, inasmuch as its engineer and manager testified that in the last several years there had been no increase in claims against it or against its insurance carriers. It further appears that insurance premiums paid would be deductible for income tax purposes, but the $5,000 paid to fund the self-insurance reserve is not deductible; therefore, the self-insurance reserve would yield the utility only one dollar of protection for every two dollars paid.
We find, therefore, that on the record before us the ruling of the Board was supported by substantial competent evidence in not allowing the $5,000 per year to establish the self-insurance reserve of $55,000. See Re The Springfield Gas Co., 19 PUR (NS) 1 (Ohio Pub.Util.Com. 1937); Re California Oregon Power Co., 35 PUR 3d 329 (Ore. Pub.Util.Com. 1960); Re Rockford Electric Co., PUR 1925 D 154 (Ill. Commerce Com. 1925).
The order herein challenged set forth that the utility claimed a total rate case expense for the case involved herein of $18,000 to be amortized over five years at the rate of $3,600 per year. The Board rejected this claim on the ground that it resulted primarily from the repudiation by the utility of its own records.
The Florida Public Service Commission has held that expenses incurred by a utility in a proceeding before a regulatory body should be included in the utility's operating expenses. Jacksonville Gas Co. v. Jacksonville, 82 PUR (NS) 67 (Fla.R.R. & Pub. Util.Com. 1949). See also Peoples Water & Gas Co. v. City of Miami Beach, 90 PUR (NS) 401, (Fla. Cir. Ct. 1951).
The records referred to in the order are the income tax records and audit reports. There were a number of other contested items, however, which required additional work and accounting, and which did not rely upon those records. We therefore find that there was a departure from the essential requirements of the law in disallowing the utility's rate case expenses upon the grounds that the rate case resulted primarily from the utility's repudiation of its own records.
The most important point determined by the Board involved water and sewer lines costing $1,624,757, which were installed by the utility to serve the subdivision of which it was also the developer. *367 The question was whether these costs of $1,624,757 should be included in the utility's rate base in its entirety, in all, or in part. The utility contends that this sum is comprised of two parts; a deferred tax reserve in the amount of $844,000 and a net investment of $780,000, and that the deferred tax reserve should be deducted from the $1,624,757 added to its plant and service account, thereby increasing its rate base in the amount of $780,000. The Board disagreed with the utility and took the position that the entire $1,624,757 had been recovered by the utility from its sales to the purchaser of homes and lots in the subdivision (which has been completely developed in this aspect), and that this was therefore a contribution in aid of construction. The Board heard testimony and took evidence on this factual issue. It received nine federal income tax returns filed by the utility between 1955 and 1963, together with seven certified annual audit reports for the fiscal years between 1957 and 1963, together with two reports from the utility preceding the order to show cause, all of which treated the $1,624,757 as land development costs and conclusively showed that this entire amount had been recovered by the utility.
The utility admits that for income tax purposes this sum was included in the cost of goods sold, had been charged off, had been recovered, and had a zero tax basis.
The position of the Board is that these sums were paid for by the purchasers of homes from the utility, which was also the developer, that it has recovered completely these costs, and that this amount should be treated as contributions. If the contentions of the utility had been adopted by the Board, and these sums were now included in the rate base, it would require the purchasers of homes in the subdivision who have already paid for the items as development costs, to pay a return on this additional sum which would be included in the rate base. Ordinarily, a utility may not capitalize and include in its rate base items which have been accounted for and charged off as operating expenses. This is true because expensed items have been paid for and their costs recovered and the utilities are estopped therefore to capitalize those items which they have already expensed. See Re Mondovi Telephone Company, PUR 1933 D 142 (Wisc.Pub.Serv.Com. 1932); Re Los Angeles Gas & Electric Corp., PUR 1931 A 132 (Cal.R.R.Com. 1930); Horton v. Badger State Teleph. & Teleg. Co., 1 PUR (NS) 409 (Wisc.Pub.Serv. Com. 1933). In Las Vegas Land and Water Co. v. P.S.C., 98 PUR (NS) 493 (Nev.Pub. Serv.Com. 1952), a commission held that defense projects which had been completely amortized on the books of a water company under a short term amortization authorized by the Internal Revenue Service might not be put back on the books of the company and included in the rate base.
The order of the Board included the following, with which we concur:
* * * * * *
"The most applicable case cited to the Board which holds squarely upon an attempt by a utility to restore to rate base the cost of lines written off for tax purposes as land development costs is the case Re Green-Field Water Co. (1964-N.J. PUB) 53 PUR[3] 670. In that case, water mains having cost of approximately $150,000 were installed by two development companies which paid the installation costs, charged off the costs as expenses for income tax purposes, and offset the costs against the sales prices of homes. The mains then had a zero tax basis to the development companies. The development companies, whose principal stockholder owned one-half the securities of the utility, conveyed and transferred the mains to the utility in consideration of 1500 shares of stock having a par value of $100.00 per share. In summary the New Jersey Public Utilities Commission stated:
`* * * It also appears that the developers in the area turned over the entire *368 distribution facilities required to furnish water service to their housing developments and that these facilities were paid for by such developers and the expenses thereof were fully recovered for income tax purposes so that the value of these facilities to the transferors was carried at a zero basis.
`In view of these conclusions it is the board's opinion that $150,000 of utility plant representing the distribution system facilities was, in fact, paid for by the homeowners in the developments and contributed to the petitioner. Under these circumstances the board is of the opinion that the computation of rate base for purposes of this proceeding should be reduced by $150,000.'
"Like the mains in the Green-Fields case, the mains in the Westwood Lake Subdivision having a value of $1,624,757 were paid for by homeowners in the development, were contributed to the utility and should be excluded from rate base. The instant case is stronger than the Green-Fields case in that not only tax returns but also unqualified certified audits and reports to this Board exclude the $1,624,757 from rate base."
* * * * * *
Statutes and ordinances founding rate base upon "actual legitimate costs" have been held to exclude such contributions from rate base. Southern Gulf Utilities v. Water and Sewer Board, 24 Fla. Supp. 60 (Fla. Cir. Ct. 1964), affirmed in Fla.App. 1965, 180 So.2d 481; Re Peoples Gas System, 45 PUR 3d 449 (Fla.Pub.Util. Com. 1962); Re Canadian River Gas Company, 43 PUR (NS) 205 (Federal Power Commission, 1942).
We therefore find that there was substantial competent evidence in the record to sustain the correctness of the order before the Board in excluding this amount from the rate base of the utility.
In the case of Re Midwestern Gas Transmission Co., 56 PUR 3d 159, 163 (Fed. Power Com. 1964), it was stated:
* * * * * *
"Accumulated deferred tax dollars are in the nature of contributions in aid of construction collected by MGT from its customers without cost to itself. It has been the Commission's long-standing practice to deduct such contributions from the rate base; and having now determined that accumulated deferred taxes represent free capital contributions, such accumulations should be treated in the same manner as other contributions in aid of construction."
* * * * * *
The utility contends that the Board has acted in an unconstitutional and invalid manner in excluding from its rate base certain property owned by the utility which is used and was useful in serving the public at the time of the proceedings. The Board has replied to this in great detail and asserted the constitutionality and propriety of its actions.
This question is essentially directed to the validity of the Dade County Water and Sewer Regulatory Ordinance, and in particular Sec. 32-65(c), Metropolitan Dade County Code. The Board's order specifically stated that it considered itself legally unable to pass upon the validity of the ordinance which called it into existence and which it (the Board) must enforce. The order of the Circuit Court herein appealed denied the petition of the utility for certiorari. Under these circumstances, we do not feel that this question is properly before us, inasmuch as there has never been a ruling by the lower court determining the constitutionality or unconstitutionality of the ordinance in question. We therefore expressly refrain from making any finding or determination on this issue. In addition, this question would raise serious doubts as to our jurisdiction to hear this appeal. Fla. Const. Art. V, Secs. 4(2), 5(3), F.S.A.
*369 The Florida Public Service Commission has held that the following matters must be taken into consideration in determining a fair and reasonable rate of return:
1. The necessity of attracting capital and maintaining credit, in order that service may be continued and necessary expansion effected.
2. Returns of other enterprises comparable to the utility.
3. Cost of money.
4. Dividend and interest requirements and related factors, all closely associated with the general subject of attracting capital and maintaining credit, including, for example, the ratio of debt capital to equity capital in the company.
5. The risks assumed at the time of the original investment.
6. The locality of the business.
7. Efficiency of management.
8. General economic conditions.
9. The financial history of the utility.
10. The ability of the company to borrow money.
Inasmuch as it appears that some of the contested items were improper, and some proper, in the order on rates herein appealed, we will not and do not make any determination in this opinion as to the reasonableness of the rate of return fixed by the Board at six per cent.
We affirm in part and reverse in part because of the above stated reasons; and remand this cause to the Circuit Court, with directions to remand the cause to the Board, with instructions that they enter a proper order on rates in accordance with this opinion, and in order that consideration of a proper rate of return may be based on the rate base as thereafter determined, and in accordance with the rules hereinabove set forth.
It is so ordered.

ON PETITION FOR REHEARING
PER CURIAM.
The utility, by its petition for rehearing, has questioned that portion of our opinion which states:
"The order herein challenged set forth that the utility claimed a total rate case expense for the case involved herein of $18,000 * * *"
on the ground that it is uncontroverted in the record that their total expenses were $36,242.34, the $18,000 figure being a net expense, after taxes.
Our opinion, however, merely restated and adhered to the language of the Board order which categorized the expense as a "total" expense. If upon remand it should appear that the $18,000 figure was in fact a net figure, the figure should be treated as such.
The petition for rehearing is therefore denied.
It is so ordered.