In the Matter of the Application of KAANAPALI WATER CORPORATION, For Approval of Rate Increases and Revised Rate Schedules

NO. 9267

(PUC DOCKET NO. 4246)

MARCH 1, 1984

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE BERTRAM T. KANBARA IN PLACE OF ASSOCIATE JUDGE TANAKA, RECUSED

72

OPINION OF THE COURT BY HEEN, J.

Appellant Kaanapali Water Corporation (Kaanapali) appeals from Decision and Order No. 7362 (Order) of the Public Utilities Commission (Commission) of the State of Hawaii, entered on December 16, 1982, and from the Commission's Decision and Order No. 7387, entered on January 10, 1983, which denied Kaanapali's motion for reconsideration. Kaanapali has not briefed or argued error in Decision and Order No. 7387, denying the motion for reconsideration.

The question on appeal is whether the Commission erred in refusing to allow Kaanapali to use the value of the facilities and equipment used in its water supply operation as its rate base.[1] The refusal was based on the presumption that the facilities and equip-

---

[1] Rate base has been defined as, "the present value, . . . of the property both tangible and intangible owned by the company used and useful in its utility operations . . ." *Honolulu Gas Co. v. Public Utilities Commission,* 33 Haw. 487, 493 (1935).

ment had already been paid for in the sales or leases of the lots within the Kaanapali resort complex developed by Kaanapali's parent corporation, Amfac, Inc. (Amfac). We find no reversible error and affirm.

The Consumer Advocate is a party to these proceedings by virtue of Hawaii Revised Statutes (HRS) § 269-51 (1976, as amended). By separate orders dated September 11, 1981, the Commission allowed the intervention of Kaanapali Property Owners' Association and Kyo-ya Company, Ltd. By order dated October 2, 1981, the Commission allowed the intervention of the Trustees of the Estate of James Campbell. Although the Commission's Decision and the briefs state that the Sheraton Corp. was allowed to intervene, there is no order to that effect in the record.

Kaanapali was incorporated on November 27, 1978, as a wholly owned subsidiary of Amfac, Inc., for the purpose of taking over from Amfac the function of providing water service to the Kaanapali resort area of West Maui. Amfac began installing the facilities and equipment for its water supply system beginning in the late 1950s or early 1960s as a part of its development of the hotel-resort complex at Kaanapali. The first hotel began operation in 1962 and from that time until Kaanapali's incorporation water service was provided by Amfac through one of its divisions, Amfac Communities Maui. The water was obtained by way of an agreement with Pioneer Mill Company, another wholly owned subsidiary of Amfac, through Pioneer Mill's surface water system.

On June 9, 1980, Kaanapali obtained a certificate of public convenience and necessity from the Commission pursuant to HRS § 269-7.5 (1983 Supp.). Shortly after Kaanapali's certification, Amfac transferred all of the assets of its water operation, which it valued in excess of $2,640,000, to Kaanapali.

On June 30, 1981, Kaanapali applied to the Commission for approval of an increase to $1.86 per 1,000 gallons in the rate charged its consumers for the water service. At the time of the application, Kaanapali was charging $.53 per 1,000 for the first 25,000 gallons, and $.59 per 1,000 gallons thereafter. The application was amended on September 15, 1981, to request a rate of $1.84 per 1,000 gallons per customer per month.

In its application, Kaanapali described the property and equipment transferred from Amfac and used in its water operation,

assessed its depreciated value as of July 1, 1981, as $2,348,034, and proposed that figure as its rate base. This value was amended on September 15, 1981, also, to $2,275,807.

Public hearings on the application were held on Maui. All parties later submitted written testimony and documentary evidence, and an evidentiary hearing was held by the Commission on March 22 and 23, 1982, where oral testimony was taken. After briefs were filed by all parties, the Commission rendered its Order No. 7362. Kaanapali filed a motion for reconsideration on December 27, 1982, which was denied by Order No. 7387. Notice of appeal was filed on January 31, 1983.

In its Order, the Commission cited its previous decisions of *In re Waikoloa Water Company*, Decision and Order No. 5667, entered May 23, 1979, and *In re Hawaii Kai Community Services*, Decision and Order No. 5922, entered November 5, 1979, in which the Commission held that the construction of a water system as part of a real estate development created a presumption that the developer had recouped its construction costs through the sale of the lots or lease rentals, or through other means in the commercial development. Those decisions held that the payments by the purchasers and lessees were contributions in aid of construction, and a transfer of the system to a wholly owned subsidiary of the developer, at no cost to the subsidiary, clearly demonstrated that the developer had been financially reimbursed for its construction costs.

The Commission noted that the New York Public Service Commission had adopted a policy statement embracing the same principles.[2] On the basis of that policy and a number of legal decisions from other jurisdictions, the Commission then set forth the following salient characteristics, which are not exclusive, but which, if evident in a real estate development, give rise to the rebuttable factual presumption that a contribution in aid of construction was made by the lot owners or lessees unless rebutted by the applicant:

1. A water system built by the developers servicing a real estate development for a considerable period of time at a rate that is non-compensatory.

---

[2] New York Public Service Commission, *Statement Of Policy On Rates For Water Service,* September 1, 1978.

2. The formation of a wholly owned subsidiary or affiliate company when the development is complete or nearly complete and the assets and operation of the water system are transferred at no cost to the subsidiary or affiliate.

3. The initial tariff of the water company filed with the regulatory authority shows an increase in rates and charges of two of [sic] three times the prior unregulated rates and charges.
Decision and Order No. 7362, p. 27.

The Commission found:

Based on the foregoing and the record in this proceeding the Commission finds that [Kaanapali] did not make an investment in the plant prior to its certification and therefore is not entitled to a rate base in this proceeding. We find that the record shows that the [Kaanapali] plant was originally built by Amfac Inc. through its wholly owned development subsidiaries Amfac Communities Maui and its successor, Amfac Properties Corporation ("Amfac" herein). The Kaanapali water system was constructed sometime in the late 1950's or in the early 1960's to meet the water needs of the Kaanapali hotel-resort complex. The first hotel, the Sheraton Maui, opened in 1962. The water system was constructed and paid for by Amfac or its wholly owned subsidiary. Water and sewage operations were performed respectively by the water and sewage departments of Amfac. There is no dispute that Amfac has sold or leased properties in the Kaanapali development since its development and that water and sewage services were provided to the vendees or lessees at a rate that was comparable to that of the county water system. The last hotel to begin its operation is the Marriott hotel which opened its doors in 1981.

[Kaanapali] was incorporated in 1978 because Act 72, SLH 1978, required a utility, other than a utility that had a franchise awarded by the State, to obtain a CPCN [certificate of public convenience and necessity] as a prerequisite to continued operation. The evidence shows that the water system and wells were transferred to [Kaanapali] on July 1, 1980 by Amfac Properties Corporation with no consideration paid to the transferor for the plant. The transfer was approved at an Amfac Board of Directors meeting and we presume by making certain entries in each other [sic] corporate books. The initial rates filed by [Kaanapali]

with its application for a CPCN showed an increase of 247% and 212% over the previous unregulated rates.

*Id.* at 31.

The Commission held the presumption to be applicable in this case and held that the assets transferred to Kaanapali from Amfac could not be included in the rate base and disallowed depreciation on the assets. The Commission established a consumption charge of 90¢ per 1,000 gallons of water and an additional 10¢ per 1,000 gallons for an operating reserve, a total of $1.00 per 1,000 gallons. The 90¢ portion of the rate covers Kaanapali's current operating expenses. The 10¢ portion is to establish a net operating reserve for unusual major maintenance of Kaanapali's plant. The net result of the Commission's Order was to deny Kaanapali's application to use the value of its water equipment and facilities as a base for $.94 more in the requested per gallon rate increase.

Kaanapali does not dispute the principle that contributions in aid of construction cannot be included in rate base; however, it contends that the Commission's Order is clearly erroneous because the presumption should not have been applied in this case and is not supported by the evidence.

Initially, we address Intervenors' argument that Kaanapali's allegations of error should be disregarded for Kaanapali's violation of Rule 3(b)(5), Rules of the Supreme Court (RSC) (1983), in that the points on appeal section of its opening brief does not quote the findings and conclusions of the Order alleged as error, or cite the portions of the record where the errors may be found, citing *Campbell v. De Ponte,* 57 Haw. 510, 559 P.2d 739 (1977). We agree that Kaanapali's brief is deficient in that regard and has made for some difficulty in examining the record. However, the argument section of the brief is clear enough for this court to be able to determine the issues raised by Kaanapali. We decline Intervenors' invitation to disregard the alleged errors.

## STANDARD OF REVIEW

Under the provisions of HRS § 269-16(f) (1982 Supp.), an appeal from a "final" order of the Commission is taken to the supreme court. The standards to be applied by the reviewing court are estab-

lished by HRS § 91-14(g) (1976).[3] *Aio v. Hamada,* 66 Haw. 401, 664 P.2d 727 (1983); *McGlone v. Inaba,* 64 Haw. 27, 636 P.2d 158 (1981); *Outdoor Circle v. Harold K. L. Castle Trust Estate,* 4 Haw. App. 633, 675 P.2d 784 (1983); *Foster Village Community Association v. Hess,* 4 Haw. App. 463, 667 P.2d 850 (1983).

In *Outdoor Circle, supra,* we said that HRS § 91-14(g) requires that in order for the court to revise or modify an agency decision, it must find that an appellant's substantial rights may have been prejudiced by an agency under one of the six subsections of the statute. We also held that, under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2) and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6). *Id.* 4 Haw. App. at 638, 675 P.2d at 789.

In *In re Hawaii Electric Light Co.,* 60 Haw. 625, 594 P.2d 612 (1979), the supreme court further limited judicial review of administrative decisions by stating:

It is the Commission that is authorized to fix "just and reasonable" rates to be charged by public utilities, HRS § 269-16 (1976), and a reviewing court is not empowered to examine the case *de novo. See Mechanic Falls Water Co. v. Public Utilities Commission,* 381 A.2d 1080 (Me. 1977); *Davenport Water Co. v. Iowa State Commerce Commission,* ____ Iowa ____, 190 N.W.2d 583 (1971). In order to preserve the function of administrative agencies in discharging

---

[3] HRS § 91-14(g) provides:

Judicial review of contested cases.

*   *   *

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944), *quoted in In re Application of Kauai Electric Division, supra,* 60 Haw. at 187, 590 P.2d at 538; *Savannah Electric and Power Co. v. Georgia Public Service Commission,* 239 Ga. 156, 236 S.E.2d 87 (1977); *Louisiana Power & Light Co. v. Louisiana Public Service Commission,* 343 So.2d 1040 (La. 1977); *Alabama Gas Corp. v. Wallace,* 293 Ala. 594, 308 So.2d 674 (1975). An agency's findings, if supported by reliable, probative and substantial evidence, will be upheld. HRS § 91-14(g) (1976); *see City of Milford v. Illinois Commerce Commission,* 45 Ill. App. 3d 733, 359 N.E.2d 1143 (1977); *Louisiana Power & Light Co. v. Louisiana Public Service Commission, supra,* 343 So.2d at 1044; *Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 555 P.2d 163 (1976); *Alabama Public Service Commission v. Cooper Transfer Co.,* 295 Ala. 209, 326 So.2d 283 (1975); *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974).

*Id.* 60 Haw. 625, 629, 594 P.2d 612, 617. *See also In re Kauai Electric,* 60 Haw. 166, 590 P.2d 524 (1978).

Additionally, courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field. *In re Hawaii Electric Light Co., supra; In re Kauai Electric Division, supra;* 2 Am. Jur. 2d *Administrative Law* § 680 (1962).

We have examined the record in this case in the light of the above principles.

## THE COMMISSION'S APPLICATION OF
## THE REBUTTABLE FACTUAL PRESUMPTION

Kaanapali contends (1) that the adoption of the presumption was arbitrary and unreasonable because the assumptions on which it is

based are logically and legally untenable; (2) that the facts of this case do not support the presumption; and (3) that the presumption was successfully rebutted. For the reasons stated below, we hold that the Commission acted within its authority in adopting the presumption and correctly applied it in this case, and that the Commission was correct in holding that Kaanapali had failed to rebut the presumption.

1.

As stated, Kaanapali concedes that the near-universal rule is that contributions in aid of construction are properly excluded from the rate base. *Princess Anne Utilities Corporation v. Virginia ex rel. State Corporation Commission*, 211 Va. 620, 179 S.E.2d 714 (1971). However, Kaanapali argues that the legal authorities cited by the Commission do not support the presumption and are factually distinguishable.

While a strict reading of the cases indicates they do not necessarily support the presumption, there is no question that they all exclude contributions in aid of construction from a utility's rate base. *See Princess Anne Utilities Corp. v. Virginia ex rel. State Corporation Comm'n, supra; Hagerstown v. Public Service Comm'n*, 217 Md. 101, 141 A.2d 699 (1958); *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550, 267 N.E.2d 662, *cert.denied*, 404 U.S. 832, 92 S. Ct. 74, 30 L.Ed.2d 62 (1971); *Florida Cities Water Co. v. Board of City Comm'rs*, 334 So.2d 622 (Fla. App. 1976); *Killarney Water Co. v. Illinois Commerce Comm'n*, 37 Ill. 2d 345, 226 N.E.2d 858 (1967); *Ohio Utility Co. v. Public Utility Comm'n*, 58 Ohio St. 2d 153, 12 Ohio Op. 3d 167, 389 N.E.2d 483 (1979); *North Carolina ex rel. Utilities Comm'n v. Heater Utilities, Inc.*, 288 N.C. 457, 219 S.E.2d 56 (1975); *State ex rel. Valley Sewage Co. v. Public Service Comm'n*, 515 S.W.2d 845 (Mo. App. 1974); *Sunbelt Utilities v. Public Utility Comm'n*, 589 S.W.2d 392 (Tex. 1979); *Westwood Lake, Inc. v. Metropolitan Dade County Water and Sewer Board*, 203 So. 2d 363, 71 P.U.R.3d 260 (Fla. Dist. Ct. App. 1967).

Kaanapali cites a decision by the Arkansas Public Service Commission, *Re Quapaw Water Co.*, 39 P.U.R.4th 259 (Ark. 1980), as authority against the presumption. In *Quapaw*, the commission recognized that the weight of authority in those jurisdictions considering the rate base question in circumstances similar to those here

favored the presumption, but refused to apply the presumption on the basis that the accounting records of the developer indicated that the costs of construction were not recovered and the facilities were treated as a depreciable capital investment. The Arkansas commission specifically rejected the presumption and held that there may be a number of reasons for a water company to charge non-compensatory rates, and such rates do not necessarily lead to the presumption that the company had already recovered its construction costs. Kaanapali asserts that the *Quapaw* decision is better reasoned and should be followed by the Commission and, therefore, in the light of *Quapaw,* the Commission's adoption of the presumption was arbitrary and unreasonable.

The Commission's authority and power in the field of public utility regulation is derived from HRS § 269-16(b) (1983 Supp.), which reads in pertinent part:

> The commission, upon notice to the public utility, may . . . after a hearing by order regulate, fix, and change all such rates . . . so that the same shall be just and reasonable, . . . regulate the return upon its public utility property, the incurring of indebtedness relating to its public utility business, and its financial transactions, and do all things in addition which are necessary and in the exercise of such power and jurisdiction, all of which as so ordered, regulated, fixed, and changed shall be just and reasonable, and such as shall provide a fair return on the property of the utility actually used or useful for public utility purposes.

The language of the statute grants to the Commission "broad discretionary power in the area of rate regulation, providing that the procedural mandates of notice and public hearings are met, and providing that rates set are 'just and reasonable.' " *In re Kauai Electric Division,* 60 Haw. at 179, 590 P.2d at 534 (1978). The Commission's power and authority to adopt the factual presumption may be implied from its express authority to "do all things . . . which are necessary and in exercise of such power and jurisdiction." *Id.* 60 Haw. at 180, 590 P.2d at 535.

The Commission stated in its Order that the reason for the presumption is that, "if a developer has been compensated for the cost of the water system through its sales of lots, the contribution by the lot owners will be deemed a contribution in aid of construction and no return can be allowed to the affiliate or subsidiary of the

developer since there was no investment made by said affiliate or subsidiary for the plant." Decision and Order No. 7362, p. 25.

That statement of policy by the Commission comports with its duty to "protect the interests of a utility's investors so as to induce them to provide the funds needed to purchase the plant and equipment, and to protect the interests of the utility's consumers so that they pay no more than is reasonable." *In re Hawaii Electric Light Co.,* 60 Haw. at 632, 594 P.2d at 618. In the light of that caveat, Kaanapali has not convinced us that the Commission erred in seeking to protect the consumer from paying for the facilities twice over.

In every rate case involving a utility related to a real estate development, commissions universally are faced with the same questions: Did the consumer pay for the cost of construction and, if so, how will that be proven? The presumption recognizes the reality of the marketplace that the price of the lot sold or leased in a real estate development will in no instance be less than the price of the unimproved land plus the cost of improvements, including construction of the water system.[4] It also recognizes that the burden is on the

---

[4] Mr. Alfred E. Kahn, noted economist and former chairman of the New York Public Service Commission has written the following regarding the New York commission's policy:

From time to time, the New York commission found itself confronted with requests by small water companies for rate increases in the range of 200 per cent to 300 per cent, which, to our astonishment, our staff testified were necessary to enable the companies to cover their costs and provide a reasonable return on investment. It was very difficult to believe, in these cases, that costs had increased by such percentages during the period in which the then current rates had been in effect.

The explanation was not hard to find. While separate legal and accounting entities, the companies in question either are or were mere appendages of real estate developers, who got into the water business because most of their customers were unwilling to buy developed lots and houses without an attached water supply. Whatever they earned, they earned not on the water system as such, but on the combined operation. Now they were proposing to make the water operations compensatory by conventional regulatory standards.

The price that purchasers paid for the developed lots or houses must have reflected, explicitly or implicitly, the price that they were being charged for water and certain expectations about its future course. It seems a reasonable assumption that they had no reason to expect that rates would go up more than costs. If that assumption is correct, the inference is I think inescapable that to grant a water company associated with a real estate developer a rate increase by more than this would as a matter of economic fact involve permitting a double recovery of the

applicant utility to prove justification for a requested increase. *In re Kauai Electric, supra.* Finally, the presumption is rebuttable and recognizes that the proof to rebut the presumption is uniquely in the control of the applicant.

2.

Kaanapali argues that the evidence in the record did not support application of the presumption and in fact adequately rebutted the presumption.

Kaanapali first asserts that Amfac's accounting records show that, except for an accounting error relating to 1.23% of its equipment, the assets included in its proposed rate base were not written off as included in the sales or leases of its lots. Kaanapali also points to the provisions of its leases as evidence that the rates charged its customers were intended to recover its construction costs as well as its operational costs. Finally, Kaanapali asserts that the evidence shows that the rates charged prior to its application produced a profit for Amfac and were not non-compensatory.

There is substantial evidence in the record to support the Commission's decision and we are not convinced that we should disturb it. The weight to be accorded the evidence was for the Commission to determine and its determination will not be disturbed lightly. *See In re Kauai Electric,* 60 Haw. at 188, 590 P.2d at 539.

---

original investment — once in the selling prices of the houses and, second time, by courtesy of the public service commission, in the price of the water.

The solution to this problem which we were developing was to require applicants for rate increases to justify them in terms of the *increases* in costs they had incurred over some reasonable period of time in the recent past. At the least, this involved establishing a rebuttable presumption that where the rate increases justified by the rate base and rate of return criteria exceeded those demonstrated cost increases, the additional increments were *ipso facto* evidence of an attempted double recovery. To put it another way, to the extent water suppliers had been content for some substantial period of time with rates that were "noncompensatory" by traditional criteria, that constituted prima facie evidence that some portion of the property dedicated to providing water had already been recovered in the sale prices of the lots and houses. This was a satisfying application of simple economic logic. [Emphasis in original; footnote omitted.]

Kahn, *Can an Economist Find Happiness Setting Public Utility Rates?* Publ. Util. Fort., January 5, 1980, at 11.

a.

The evidence shows that when Amfac transferred the water equipment and facilities to Kaanapali, it established the depreciated value of those assets at $2,640,000. Kaanapali argues that except as noted above, the costs of those assets were not written off by Amfac as having been reimbursed. However, the argument is vitiated by the fact that there is no evidence that Kaanapali paid or agreed to pay, or was requested or required to pay, any consideration for the equipment.

Kaanapali argues that consideration for the transfer does flow to Amfac as sole shareholder of Kaanapali either through dividends or an increased net worth of Amfac's assets. The argument is without merit.

Fundamentally, Kaanapali's *raison d'etre* as a wholly owned subsidiary is to provide earnings and an increased net worth to Amfac. Whether the property transferred is paid for or not, that is its function. The transfer in the instant case did not impose on Kaanapali any legal detriment beyond that function, *see Trousseau v. Cartwright,* 10 Haw. 138 (1895), and the evidence supports the Commission's finding that the transfer was without cost to Kaanapali.

From the fact that the transfer was without consideration, the Commission could reasonably infer that Amfac was not interested in being paid by Kaanapali for the assets because Amfac had already recovered its costs from its vendees.

In its reply brief and at oral argument, Kaanapali's counsel argued that at least the cost of constructing a deep well at Honokowai and a new water distribution line at Puukolii should have been allowed as part of the rate base. Although this was not asserted as error in Kaanapali's points on appeal, we will discuss the matter.

Both facilities were installed because Pioneer Mill wanted to terminate the agreement to furnish water to Kaanapali, and because the surface system was erratic in its production and did not produce water which could meet safe drinking water standards. Construction was begun in 1976 and both facilities were put into production in 1980, after formation of Kaanapali, but before the application for increase.

The record shows, and Kaanapali's counsel stated at oral argument, that all costs of installing the well and the pipeline were paid by

Amfac. Since, as indicated above, they were transferred to Kaanapali without cost, the Commission properly excluded their value from the rate base in accordance with the presumption.

b.

Kaanapali argues that the provisions of the various conveyance documents between Amfac and its lessees and vendees require the lessees and vendees to pay water service charges including costs of construction, indicating that there were in fact no contributions in aid of construction by the consumers.

Seven of the 21 documents contain such requirements. The provisions of the other documents are either equivocal or tie the rates to Maui County's water rates. However, we do not find any merit in Kaanapali's argument.

There is no evidence that the rates charged by Amfac for water service were ever structured in any way to in fact provide a return on its capital investment or even to cover expenses. The record shows that prior to certification, the rates charged by Amfac to all of its consumers were the same as the rates charged by Maui County for its water service. Kaanapali's president testified that the rates were tied to Maui's rates and were not based on any formula for providing a fair return.

It is reasonable to conclude that the Commission placed greater weight on the historical evidence and the direct testimony than on the ambiguous language of the conveyance documents.

c.

Kaanapali finally asserts that the evidence does not support the Commission's finding that the pre-application water rates were non-compensatory. We disagree.

As noted above, Amfac's pre-certification rates were not shown to be related to its expenses or construction costs. Kaanapali argues, however, that its water operation was producing a profit, and the Commission's determination that the operation was in fact unprofitable because its financial reports did not provide for any deduction for expenses of administrative overhead during the years prior to 1979 was erroneous.

The record is clear that prior to 1979 there was no attempt by Amfac to determine the true overhead costs of its water department operation because it had administrative services available from its various subsidiaries. Kaanapali's evidence itself showed overhead expense of $44,500 for 1980, $90,000 for the test year, and only $6,400 for 1979. This evidence alone was sufficient to support the Commission's inference that had a proper allocation of administrative overhead expenses been made, the pre-certification water rates would not cover operating expenses and were non-compensatory.

Kaanapali also argues that the Commission had no basis upon which to make its determination to use the figure of $50,000 as overhead expenses. However, the record does not reflect that the Commission in fact used that figure as its deduction for overhead expenses. The $50,000 was referred to only as the figure proposed by the Intervenor. There is nothing to indicate that the Commission adopted that figure. The Commission merely concluded from all the evidence that had overhead expenses been calculated into its profit and loss reports, the water operation would not have shown a profit at the pre-certification rates.

Finally, the evidence clearly shows, and at oral argument Kaanapali's counsel conceded, that the price charged Kaanapali for water furnished by Pioneer Mill, another Amfac subsidiary, was a bargain. While Kaanapali argues that Pioneer Mill resisted the low rates and began raising them in 1977, the fact remains that the bargain rates deflated Kaanapali's expenses and inflated its "profits."

The evidence was sufficient to support the Commission's finding that the low rate Amfac was paying for its water, together with Kaanapali's failure to consider overhead expense in the analysis of Amfac's water operation, was proof that Amfac's rates prior to the application for increase were non-compensatory.

3.

Kaanapali's argument that its operations do not meet the Commission's three-part test is without merit.

In addition to the matters discussed above, Kaanapali contends that the motivation for its incorporation and the transfer of the water assets was the statutory requirement of Act 72, and was not

prompted by a corporate plan to raise the water rates. Nonetheless, the evidence shows the transfer was made without consideration.

Kaanapali also argues that the requested rate increase was not of the magnitude of two or three times the prior unregulated rates. This is so because had Kaanapali continued its practice of raising its rates to match those of Maui, the rate would have risen by $.23. Also, the addition to its original facilities of the cost of constructing the new well at Honokowai accounted for approximately $.82 of the request. Finally, other expenses excluded from the rate base by the Commission accounted for another $.03 of the requested increase. According to Kaanapali, the result after deducting these items from the proposed rate is a requested increase of only $37.7% not the two to three-fold increase found by the Commission. Kaanapali's reasoning is completely specious.

Even if all those matters are correct, the fact still remains that Kaanapali was requesting an increase of nearly 250% more than the previous unregulated rates.

Finally, Kaanapali argues that there is no evidence indicating that the development of the Kaanapali resort area was complete or nearly complete when it was incorporated and the assets transferred. Kaanapali is correct. However, in view of the evidence in the entire record that is not sufficient to satisfy Kaanapali's heavy burden of showing that the Commission's decision was unjust and unreasonable in its consequences. *In re Hawaii Electric Light Co., supra.*

## CONCLUSION

We do not find upon consideration of all the evidence in the record "any clear error in the conclusion reached by the Commission as to the valuation of " Kaanapali's rate base. *In re Kauai Electric, supra.* Kaanapali has failed to carry its burden of showing that the Commission's Order was unjust and unreasonable in its consequences and therefore invalid, *id.* Kaanapali has not shown that the Commission's Decision violates any of the provisions of HRS § 91-14(g) and we are not left with a definite and firm conviction that a mistake has been made. *Aio v. Hamada, supra.*

Affirmed.

*Robert E. Strand (Alan M. Oshima* with him on the briefs; *Carlsmith, Carlsmith, Wichman & Case* of counsel) for appellant, Kaanapali Water Corp.

*Ronald Shigekane,* Deputy Attorney General, for Consumer Advocate, Dept. of Commerce & Consumer Affairs.

*David W. Proudfoot (Daniel H. Case* with him on the brief; *Case, Kay & Lynch* of counsel) for appellee, Kaanapali Property Owners' Association.

*Paul S. Aoki (Clinton R. Ashford* with him on the brief; *Ashford & Wriston* of counsel) for appellee, Estate of James Campbell (appearance only).

*Arthur K. Goto (Iwai, Motooka & Goto* of counsel) for appellee, Kyo-ya Co., Ltd. (appearance only).