925 P.2d 302

### In the Matter of the Application of PUHI SEWER & WATER COMPANY, INC.

#### No. 18204.

Supreme Court of Hawai'i.

Sept. 27, 1996.

134

Alan M. Oshima and Lawrence M. Rei-furth (Michael H. Lau and Dana M.O. Viola, with them on the briefs of Oshima Chun Fong & Chung), Honolulu, for applicant-appellant Puhi Sewer & Water Co., Inc.

Collette H. Gomoto (Clarence M. Nagao and Robert W. Fung, with her on the brief), Honolulu, for Public Utilities Commission.

Before MOON, C.J., and KLEIN, LEVINSON and RAMIL, JJ., and MILKS, Circuit Judge, in place of NAKAYAMA, J., recused.

KLEIN, Justice.

Applicant–Appellant Puhi Sewer & Water Co., Inc. (Puhi) appeals from Decision and Order No. 13304 of the Public Utilities Commission of the State of Hawai'i (Commission), entered on June 14, 1994. For the reasons set forth below, we vacate the Commission's Decision and Order and remand for further proceedings.

## I. BACKGROUND

Grove Farm Properties, Inc. (Grove Farm), a Hawai'i corporation, is in the initial phase of an extensive development project consisting of residential units, commercial properties and a golf course in the Li-hue/Puhi area on the Island of Kauai. In order to obtain zoning approval for the project, Grove Farm committed to build and operate a wastewater collection and sewage treatment facility to service the proposed development area. The construction and operation of a sewage facility was made necessary by the fact that there are currently no facilities capable of servicing the area.

Puhi was subsequently incorporated as a wholly owned subsidiary of Grove Farm for the purpose of operating the sewage facility. The facility was then transferred to Puhi in exchange for stocks and a promissory note totalling $10 million, which Grove Farm and Puhi contend approximates the cost of the plant.

On December 21, 1993, Puhi filed an application for a certificate of public convenience and necessity (CPCN) to provide wastewater collection and sewage treatment services to the Lihue/Puhi area.[1] Puhi also requested approval of its proposed rate and rules and regulations.

On January 1, 1993, the Consumer Advocacy Division of the Department of Commerce and Consumer Affairs (Consumer Advocate) filed a statement of position notifying the Commission of its intent to participate in the proceedings. On July 7, 1993, the Consumer Advocate filed a statement with the Commission stating that (1) Puhi was financially and otherwise fit and able to provide the proposed service, (2) the proposed service was necessary, and (3) Puhi's proposed rules and regulations were reasonable. On September 27, 1993, Puhi and the Consumer Advocate submitted to the Commission a stipulated agreement concerning Puhi's proposed rate. The parties agreed that Puhi should be allowed to recover its $10 million cost of constructing the sewage plant by including that cost in Puhi's rate base.

---

**1.** Pursuant to Hawaii Revised Statutes (HRS) § 269–7.5 (1993), a public utility is required to

obtain a CPCN from the Commission prior to commencing operations.

In response, the Commission issued Interim Decision and Order No. 12654 on October 7, 1993. In the Interim Decision and Order, the Commission approved Puhi's request for the CPCN, finding Puhi to be fit, willing and able to provide the proposed service. Additionally, the Commission determined that the proposed service was necessary and that the proposed rules and regulations were reasonable. The Commission, however, denied the proposed rate because

> whenever water and sewage treatment facilities are built in conjunction with or in the course of land development, the presumption is that the cost of the facilities are passed on to those who purchase lots in the development (and become customers of the utility company) through the purchase price they pay for the lots.... This is a reasonable presumption, for it is common practice in real estate development for the cost of construction of water and sewage treatment facilities to be reflected in the prices paid by purchasers of lots in the completed development.

Interim Decision and Order No. 12654, at 12–13 (October 7, 1993) (citation and footnote omitted).

Moreover, in reply to Puhi's argument that the Commission's prior decisions held that a developer/utility relationship *plus* other salient characteristics were required to trigger the presumption, the Commission stated:

> We deem it imperative that we set aside any such reading of our past decisions. The past dockets when we concluded that the cost of the water or sewage treatment facilities should be excluded from the utility's rate base, we found, variously, that the facilities had been completed before the issuance of a certificate of public convenience and necessity, that the facilities had been transferred to the utility company by its parent company at no cost, or that there had been a history of noncompensatory, unregulated rates for a long period of time. In each instance, such findings were recited to support our conclusion that the facilities in question should not be included in the utility company's rate base, since such findings supported the presumption that the customers had already paid for

the cost of the facilities through the prices they paid for their lots. We did not intend to imply that the existence of reverse conditions warrant the inclusion of the construction cost in the utility's rate base.

> We now make it clear that the issuance of a certificate of public convenience and necessity before completion of the facilities, the transfer of the facilities to the utility at a valuable consideration, and the absence of a history of non-compensatory, unregulated rates for a long period of time, singularly or collectively, in and of themselves, are insufficient to rebut the presumption that the utility company's consumers paid for the cost of the construction of the facilities through the prices they paid for their lots. The presence of these facts say very little about the contributions made toward the construction of the facilities.

*Id.* at 14–15 (footnotes omitted). Because this presumption was not addressed by Puhi or the Consumer Advocate, the Commission gave the parties an opportunity to respond and to rebut the presumption.

On November 15, 1993, Puhi filed a Memorandum of Points and Authorities in Support of Rate Base and Rebuttal of Presumption. The gist of Puhi's argument was that the presumption was inapplicable to its case because Puhi was not requesting a rate increase, but applying for an initial rate determination prior to commencing business.

A hearing was held on December 6, 1993. At the hearing, Puhi offered the testimony of Jed Sueoka, Treasurer of Puhi, Greg Kamm, Vice President of Puhi, Anthony Zarillo, former Chief of Staff of New Jersey Public Service Commission, and various witnesses representing the Consumer Advocate. Mr. Sueoka, Mr. Kamm, Mr. Zarillo, and the Consumer Advocate's witnesses testified that the $10 million infrastructure cost should be included in the rate base because (1) the presumption did not apply, and (2) if applicable, the presumption was sufficiently rebutted.

On June 14, 1994, the Commission filed Decision and Order No. 13304. In the Decision and Order, the Commission reiterated that a rebuttable presumption arises whenev-

er a real estate developer constructs a water or sewage facility to serve its development that the costs of the facilities were passed on to the purchasers of the lots. The Commission explained that this presumption was necessary to protect the consumers from paying twice for the same facility—once through the purchase price of the lot and a second time through the rates.

After concluding that the developer/utility affiliation created a rebuttable presumption of capital investment recovery, the Commission referred to the New York Public Service Commission's Statement of Policy Rates for Water, Issued September 21, 1978 (N.Y. Policy Statement), for guidelines on ways that Puhi could rebut the presumption. The list included, but was not limited to:

1. A showing that prior unregulated rates were designed to cover the utility's operating expenses and capital costs.

2. Evidence that prospective purchasers were told clearly and specifically that the lot prices do not include the cost of the improvement.

3. A showing that the proposed rate is similar to, or dissimilar from, rates charged by comparable companies.

4. A showing that, among comparable items of realty traded under comparable conditions, there are price differentials that can be isolated and attributed specifically to differing terms on which sewer service is provided.

Decision and Order No. 13304, at 4–5 (June 14, 1994) (citing New York Public Service Commission's Statement of Policy Rates for Water, at 7–9 (September 21, 1978)).

After reviewing the evidence and arguments presented by Puhi, the Commission concluded that Puhi had failed to rebut the presumption. Consequently, the Commission denied Puhi's request to include the $10 million cost of constructing the sewage facility in its rate base. Puhi timely appealed on July 5, 1994.

## II. STANDARD OF REVIEW

An appeal from a final order of the Public Utilities Commission is taken to the Supreme Court of Hawai'i. HRS § 269–16(f) (1993).

The applicable standard of review is established by HRS § 91–14(g) (1993), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

▬ Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of its discretion is reviewable under subsection (6). *Smith v. State, Dep't of Labor & Indus. Relations*, 80 Hawai'i 150, 153, 907 P.2d 101, 104 (1995).

Accordingly, a reviewing court will reverse an agency's findings of fact if it concludes that such a finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. HRS § 91–14(g)(5). On the other hand, the agency's conclusions of law are freely reviewable. *Amfac, Inc. v. Waikiki Beachcomber Investment Co.*, 74 Haw. 85, [119], 839 P.2d 10, [28], *reconsideration denied*, 74 Haw. [650], 843 P.2d 144 (1992). *Sussel v. Civil Service Comm'n of the City and County of Honolulu*, 74 Haw. 599, 610, 851 P.2d 311, 317 (1993). We further recognize that:

It is the Commission that is authorized to fix "just and reasonable" rates to be

charged by public utilities, HRS § 269–16, and a reviewing court is not empowered to examine the case de novo.... In order to preserve the function of the administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." ... An agency's findings, if supported by reliable, probative and substantial evidence, will be upheld....

*In Re Kaanapali Water Corp.*, 5 Haw.App. 71, 77–78, 678 P.2d 584, 589 (1984) (quotation omitted).

### III. *DISCUSSION*

Puhi raises the following issues on appeal:

1. Whether the Commission erred in applying the presumption that Puhi's customers paid for the cost of the construction of Puhi's sewage facilities through the prices they paid for their lots.

2. Whether the Commission erred in concluding that Puhi had failed to refute the presumption.

3. Whether the Commission, by failing to specify what would constitute a sufficient rebuttal, essentially created an unlawful irrebuttable presumption.

4. Whether the monthly residential sewer rate established by the Commission, which excludes the infrastructure costs, amounts to a confiscatory taking.

2. A typical contribution in aid of construction occurs when an individual or group of individuals who desires service from a utility company is located so far from the company's existing main or line that the company is unwilling to bear the expense of constructing the necessary extension of its facilities. The utility company will agree to render the service if the individuals who desire it will pay all or part of the cost of construction. Title to the newly constructed facility passes to the utility which agrees to use such facility to supply the service to those who have paid for the line or main extension. The new plant is thereafter used and maintained by the company similarly to its

Because we hold that the Commission erred in applying the rebuttable presumption in this case, we only address Puhi's first issue on appeal.

■ A public utility is allowed "a fair return on the property of the utility actually used or useful for public utility purposes." HRS § 269–16(b) (1993). "The determination of a proper rate base thus entails a valuation of the property of the utility devoted to public utility purposes on which the public utility is allowed to earn an appropriate rate of return." *In Re Hawaiian Telephone Co.*, 65 Haw. 293, 297, 651 P.2d 475, 479 (1982).

■ In determining the proper rate base, the "near-universal rule is that contributions in aid of construction are properly excluded from the rate base." *Kaanapali*, 5 Haw.App. at 79, 678 P.2d at 590. "The rule is based on principles of fairness. It is inequitable to require utility customers to pay a return on property for which they, and not the utility, have paid." *Princess Anne Utilities Corp. v. Commonwealth of Virginia*, 211 Va. 620, 179 S.E.2d 714, 716 (1971) (citation omitted).

A unique problem arises, however, in evaluating contributions in aid of construction (CIAC) where a water or sewage facility is constructed as part of a real estate development project.[2] As the Intermediate Court of Appeals (ICA) articulated in *Kaanapali*,

[i]n every rate case involving a utility related to a real estate development, commissions universally are faced with the same questions: Did the consumer pay for the cost of construction and, if so, how will that be proven?

other facilities. The amount paid by these customers is entered on the books of the company as a contribution in aid of construction. *Cogent Public Service v. Arizona Corp. Comm'n*, 142 Ariz. 52, 688 P.2d 698, 701 (App.1984).

"Payments made by utility subscribers to a developer affiliate of a utility for improvements, such as water and sewer service, subsequently transferred to the utility, have also been considered to be contributions in aid of construction." *Id.* 688 P.2d at 701 n. 3 (citing *Du Page Utility Co. v. Illinois Commerce Commission*, 47 Ill.2d 550, 267 N.E.2d 662, *cert. denied*, 404 U.S. 832, 92 S.Ct. 74, 30 L.Ed.2d 62 (1971)).

5 Haw.App. at 81, 678 P.2d at 591. In recognition of this problem, the ICA upheld the Commission's policy that the "construction of a [utility] system as part of a real estate development created a [rebuttable] presumption that the developer had recouped its construction costs through the sale of the lots or lease rentals, or through other means in the commercial development." *Id.* at 74, 678 P.2d at 587. The presumption, however, was limited by the ICA to instances where there is a utility company/real estate developer relationship *and* other salient characteristics. Thus, in upholding the Commission's application of the presumption in *Kaanapali*, the ICA considered

the following salient characteristics, which are not exclusive, but which, if evident in real estate development, give rise to the rebuttable factual presumption that a contribution in aid of construction was made by the lot owners or lessees unless rebutted by the applicant:

1. A [utility] system built by the developers servicing a real estate development for a considerable period of time at a rate that is non-compensatory.

2. The formation of a wholly owned subsidiary or affiliate company when the development is complete or nearly complete and the assets and operation of the [utility] system are transferred at no cost to the subsidiary or affiliate.

3. The initial tariff of the [utility] company filed with the regulatory authority shows an increase in rates and charges of two of [sic] three times the prior unregulated rates and charges.

*Id.* at 74–75, 678 P.2d at 587 (citing the Public Utilities Commission of the State of Hawai'i, Decision and Order No. 7362, at 27 (December 16, 1982)). In *Kaanapali*, for example, the developer had operated the water system for 20 years at non-compensatory rates; the developer transferred the system to the utility company for no consideration; and the utility company requested a rate increase of more than three times the prior rate. *Id.* at 82–86, 678 P.2d at 592–94. Based on these factors, the ICA upheld the Commission's application of the rebuttal presumption pursuant to the Commission's pow-

er and authority to "do all things ... which are necessary and in exercise" of its "broad discretionary power in the area of rate regulation[.]" *Id.* at 80, 678 P.2d at 590–91 (citation omitted).

This comports with the original purpose of the presumption. On September 21, 1978, the New York Public Service Commission (N.Y.PSC) issued a Statement of Policy on Rates for Water Service that created the presumption referenced by both the Commission in this case and the ICA in *Kaanapali*. The NYPSC created the presumption specifically to prevent "problems that may result from the disparity between an unregulated rate (or 'free' service) and the initial regulated rate subsequently authorized by the Commission." NY Policy Statement at 4. The NYPSC explained:

Typically, the company seeks [the commission's] approval of a new rate only after the lapse of a period during which it has been charging consumers some rates for water service, or giving them ostensibly 'free' service, without [the commission's] approval.

In many cases the initial rate submitted for our approval is two or three times the sum of the previous, unregulated rate (if any) plus increments attributable to changes, in expenses and in capital costs, that have occurred since the water service was established. At the same time, however, the proposed initial rate may seem reasonable when we evaluate all current expenses and capital costs (rather than considering only changes that would have occurred among these items since service began, which typically would justify only an increase approximately parallel to the rate of inflation). In such cases, obviously, the company originally was providing service without charging a rate that sufficed to cover the expenses and capital costs of the water system.

This practice has two undesirable features. First, it is inconsistent with the consumer's reasonable expectation (in the absence of a clear warning to the contrary) that the rate charged for water service will not increase substantially faster than in-

creases in the cost of providing the service....

....

Second, if we approve a proposed regulated rate merely because it reflects the cost of providing service during the period when the new rate will be in effect, and we do not also examine whether such approval will result in a rate increase greater than any increase in the cost of providing service, we may effectively be annulling a customer contribution [CIAC] that was reflected in the previous, unregulated rate. This is because companies normally do not provide water service on a non-compensatory basis; if the unregulated rates failed to cover the operating expenses and the apparent capital costs of the water system, we can infer that the company was compensated for such costs and expenses by means of the proceeds it realized from real estate sales instead of through water rates. In such circumstances, the sale price of the real estate reflects a customer contribution to the water plant, which we might improperly fail to recognize if we authorized a rate increase greater than any increase in the company's operating expenses and capital costs.

NY Policy Statement ·at 2–3. In response, the NYPSC created a rebuttable presumption that

a regulated rate will afford the company reasonable opportunity to earn a fair return on its investment in [utility] plant if the rate reflects all new developments, in operating expenses, capital costs, and value of plant, *since the time when service began free of charge or at an unregulated rate.*

*Id.* at 5 (emphasis added). As explained by Alfred Kahn, noted economist and former chairman of the New York Public Service Commission, the fact that the utility company was "content for some substantial period of time with rates that were 'noncompensatory' by traditional criteria ... constituted *prima facie evidence* that some portion of the property dedicated to providing [the public utility's service] had already been recovered in the sale prices of the lots and houses." Kahn, "Can an Economist Find Happiness

Setting Public Utility Rates?" *Publ. Util. Fort.,* January 5, 1978, at 15 (emphasis added).

█ The presumption, therefore, does not arise simply based on the existence of a real estate developer and utility company affiliation. Rather, the presumption is triggered only if the facts surrounding a specific case reveal an attempt by a real estate developer to obtain a double recovery of its capital construction costs—once through the sale price of the lots and then again through a rate increase obtained by its wholly owned utility company. Accordingly, we hold that the rebuttable presumption that a contribution was made by lot owners, or lessees, for the construction of the utility system arises only if the presence of certain factors, or salient characteristics, reveals an intent by a real estate developer to obtain a double recovery for its capital construction costs. As discussed earlier, these salient characteristics include, but are not limited to:

1. A [utility] system built by the developers servicing a real estate development for a considerable period of time at a rate that is non-compensatory.

2. The formation of a wholly owned subsidiary or affiliate company when the development is complete or nearly complete and the assets and operation of the [utility] system are transferred at no cost to the subsidiary or affiliate.

3. The initial tariff of the [utility] company filed with the regulatory authority shows an increase in rates and charges of two of [sic] three times the prior unregulated rates and charges.

*Kaanapali,* 5 Haw.App. at 74–75, 678 P.2d at 587 (citing the Public Utilities Commission of the State of Hawai'i, Decision and Order No. 7362, at 27 (December 16, 1982)).

█ In Puhi's case, the factors that give rise to the presumption are not present. First, there is no history of non-compensatory rates because Puhi applied for a CPCN and requested a determination of its initial rate prior to commencement of business. Second, Grove Farm constructed and transferred the sewage facility to Puhi in exchange for $10 million in stocks and a prom-

issory note, which Grove Farm and Puhi contend approximates the cost of the plant. Third, the initial tariff or rate for Puhi's customers will be the first rate that prospective customers will be charged. *See id.* at 82–86, 678 P.2d at 592–94.

■ Additionally, the concerns that prompted the NYPSC to create the presumption were partially remedied by the enactment of HRS § 269–7.5 (1993).[3] As the NYPSC commented with the passage of a similar statute in New York:[4]

[I]n water systems that begin operating after the effective date of the statute, the first rate that consumers experience will be a previously published, regulated rate. Regardless of whether we must diminish the proposed regulated rate in any particular case because there have been customer contributions to the system, the *problems of violated expectations and double recovery will be eliminated in systems controlled by the statute because the initial rate will be ascertainable in advance.*

NY Policy Statement at 4–5 (emphasis added). The NYPSC still maintained the presumption, however, because

the statute does not solve the problem posed by companies that began water operations before its effective date but have not yet proposed initial regulated rates, and companies now charging regulated

rates that fail to reflect customer contributions collected in the form of realty sale proceeds.

Similarly, here, the concerns of violated consumer expectations and double recovery are eliminated by HRS § 269–7.5, which requires a public utility to obtain a CPCN, including the public utility's proposed initial rates, *prior* to the commencement of its operations. The presumption still applies, however, to cases involving utility companies that commenced operations before 1978, the effective date of HRS § 269–7.5, but have not yet proposed initial regulated rates, and utility companies now charging regulated rates that fail to reflect CIACs included in the initial sale price of the lots. Here, Puhi was subjected to applied for a CPCN prior to the commencement of its operations.

Accordingly, we hold that, based on the lack of any salient characteristics showing an intent by Grove Farm to obtain a double recovery of its capital construction costs, coupled with the regulatory scheme of HRS § 269–7.5, the rebuttable presumption is inapplicable to the instant case.

We do not suggest by this opinion that the Commission must include the cost of the facility in Puhi's rate base. The general proposition that CIACs are properly excluded from the rate base still holds true. As

3. HRS § 269–7.5(a) provides:

No public utility, as defined in section 269–1, shall commence its business without first having obtained from the commission a certificate of public convenience and necessity. Applications for certificates shall be made in writing to the commission and shall comply with the requirements prescribed in the commission's rules. The application shall include the type of service to be performed, the geographical scope of the operation, the type of equipment to be employed in the service, the name of competing utilities for the proposed service, a statement of its financial ability to render the proposed service, a current financial statement of the applicant, and the rates or charges proposed to be charged including the rules and regulations governing the proposed service.

4. New York Public Service Law § 89–e(2) (1989) provides:

No water-works corporation shall begin operation of a water system or extension thereof, supply water or charge for water without first

filing with the commission, at least one hundred twenty days prior to the date upon which service is to begin, a schedule of rates, charges, rules, regulations and such further information as the commission may require showing the basis for the corporation's determination of its proposed rate. The commission shall have power to approve or disapprove such proposed rate, or to condition an approval upon the corporation's use of a specific method of cost apportionment, for both rate and accounting purposes, among related enterprises or operations. The commission shall take final action on the proposed schedule of rates within two hundred forty days after it is filed or after information required by the commission is furnished, whichever is later, provided that within one hundred twenty days after the schedule is filed or information is received, whichever is later, the schedule of rates filed by the corporation shall be allowed to become effective, either finally or on a temporary basis, on such terms as may be imposed by the commission in accordance with the procedures set forth in section one hundred thirteen of this act.

such, the Commission may still deny Puhi's requested rate if, after a full and fair evaluation of the evidence, the Commission determines that the cost of constructing the facility was included in the purchase price of the lots. *See* HRS § 269–16 (1993).

## IV. CONCLUSION

We vacate the Commission's Decision and Order No. 13304, entered on June 14, 1994, and remand for further proceedings.