995 P.2d 776

In the Matter of the Application of GRAY LINE HAWAI'I, LTD. For Permanent Approval to Bifurcate Its Certificate of Public Convenience and Necessity to Operate in the Over–25 Passenger Classifications on the Islands Maui, Hawaii, and Kauai to Polynesian Adventure Tours, Inc.

In the Matter of the Application of Gray Line Hawai'i, Ltd. For Permanent Approval to Bifurcate Its Certificate of Public Convenience and Necessity and to Transfer Its Authority to Operate in the 1 to 7, 8 to 25 and Over–25 Passenger Classifications on the Island of Oahu to RDH Transportation Services, Inc.

In the Matter of the Application of Gray Line Hawai'i, Ltd. For Permanent Approval to Bifurcate Its Certificate of Public Convenience and Necessity and to Transfer Its Authority to Operate in the 1 to 7 and 8 to 25 Passenger Classification on the Islands of Maui, Hawaii, and Kauai to Aloha–State Tour & Transportation Co., Ltd.

Nos. 21839, 21915, 21916.

Supreme Court of Hawai'i.

March 30, 2000.

Lance Castroverde, on the briefs, for appellants Robert's Tours & Transportation,

Inc., PHT, Inc., Trans Hawaiian–Hawai'i, Inc., Trans Hawaiian–Kauai, Inc., Trans Hawaiian–Maui, Inc., Trans Hawaiian–Oahu, Inc.

J. Douglas Ing, Wray H. Kondo, and Teri Y. Kondo (of Watanabe, Ing & Kawashima), on the briefs, for appellee Jack's Tours, Inc.

Rodney H. Ushida, on the briefs, for appellee Aloha–State Tour & Transportation Co., Ltd.

Steven Guttman and Alan Ma, on the briefs, for appellee Gray Line Hawai'i, Ltd.

Thomas W. Williams and Peter Y. Kikuta (of Goodsill Anderson Quinn & Stifel), on the briefs, for appellees Polynesian Adventure Tours, Inc. and RDH Transp. Services, Inc.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Intermediate Court of Appeals Judge BURNS, Assigned by Reason of Vacancy.

Opinion of the Court by LEVINSON, J.

In appeal No. 21839, the appellant Robert's Tours and Transportation, Inc. (Robert's) has appealed: (1) the Public Utilities Commission's (PUC's) decision and order filed on July 1, 1998 (order No. 16399), which granted the application of the appellee Gray Line Hawai'i, Ltd. (Gray Line) (a) to bifurcate those portions of its Certificate of Public Convenience and Necessity (CPCN) that authorized a common carrier by motor vehicle to operate in the one-to-seven and eight-to-twenty-five passenger classifications on the islands of Hawai'i, Kauai'i, and Maui and (b) to transfer the operating authority in the one-to-seven and eight-to-twenty-five passenger classifications on the islands of Hawai'i, Kauai'i, and Maui to the appellee Aloha–State Tour & Transportation Co., Ltd. (Aloha–State); and (2) the PUC's order filed on July 23, 1998, denying Robert's motion for

reconsideration of the decision and order No. 16399.

In appeal No. 21915, the appellants Robert's, Polynesian Hospitality Tours, Inc. (PHT), and Trans Hawaiian–Oahu, Inc. (THO) have appealed: (1) the PUC's decision and order filed on July 20, 1998 (order No. 16422), which granted the application of Gray Line (a) to bifurcate those portions of its CPCN that authorized a common carrier by motor vehicle to operate in the one-to-seven and eight-to-twenty-five passenger classifications on the island of O'ahu and (b) to transfer the operating authority in the one-to-seven and eight-to-twenty-five passenger classifications on the island of O'ahu to the appellee Ronald D. Howard Transportation Services, Inc. (RDH); and (2) the PUC's order filed on August 24, 1998 (order No. 16477), denying Robert's, PHT, and THO's motion for reconsideration of the decision and order No. 16422.

In appeal No. 21916, the appellants Robert's, PHT, Trans Hawaiian–Hawai'i, Inc. (THH), Trans Hawaiian–Kauai, Inc. (THK), and Trans Hawaiian–Maui, Inc. (THM) have appealed (1) the PUC's decision and order filed on July 20, 1998 (order No. 16422), which granted the application of Gray Line (a) to bifurcate those portions of its CPCN that authorized a common carrier by motor vehicle to operate in the over-twenty-five passenger classifications on the islands of Hawai'i, Kaua'i, and Maui and (b) to transfer the operating authority in the over-twenty-five passenger classifications on the islands of Hawai'i, Kaua'i, and Maui to the appellee Polynesian Adventure Tours, Inc. (Polynesian); and (2) the PUC's order filed on August 24, 1998 (order No. 16477), denying Robert's, PHT, THH, THK, and THM's motion for reconsideration of order No. 16422.

We consolidated Nos. 21916, 21915, and 21839. In the consolidated appeal, Robert's, PHT, THH, THK, THM, and THO[1] argue

---

1. Seven competing motor carriers (Robert's, Jack's Tours, Inc. (Jack's), PHT, THH, THK, THM, and THO) intervened in the PUC proceedings regarding Gray Line's transfer applications. However, only Robert's filed a notice of appeal that resulted in No. 21839, only Robert's, PHT, and THO filed a notice of appeal that resulted in No. 21915, and only Robert's, PHT, THH, THK, and THM filed a notice of appeal that resulted in

No. 21916. All other parties, including Jack's, are therefore appellees. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 3(d) (1999) ("The party appealing shall be denominated the appellant.... All other parties shall be denominated appellees.... Any appellee who supports the position of an appellant shall meet the time schedule for filing papers that is provided for that appellant."). Subsequent to this court's or-

that the PUC erred: (1) in omitting from its consideration the issue whether the transfers sought by Gray Line were required by public convenience and necessity; and (2) in finding (a) that the approval of the transfers of the Gray Line's operating authority to Aloha–State, RDH, and Polynesian would be in the public interest, (b) that the approval of the transfers would not directly harm the competing motor carriers or adversely affect their ability to provide transportation services to the public, (c) that approval of the transfers would benefit the former employees of the Gray Line in the long term, and (d) that the transferee motor carriers were financially fit and able to provide the services proposed by Gray Line's applications. We affirm the PUC's orders.

## I. BACKGROUND

### A. The Closing Of Gray Line's Operations

Prior to March 18, 1996, Gray Line was a common carrier by motor vehicle authorized to engage in the transport of passengers in the one-to-seven, eight-to-twenty-five, and over-twenty-five passenger classification categories on the islands of Oʻahu, Hawaiʻi, Maui, and Kauaʻi, pursuant to a CPCN issued by the PUC. On March 18, 1996, Gray Line abruptly ceased its operations, terminated its employees, and stopped serving its customers. The other carriers (including Robert's, Jack's, PHT, THH, THK, THM, and THO) began serving Gray Line's former customers and made investments to increase their capacity to meet the demand created by these additional customers. Gray Line proceeded to liquidate its assets to pay its creditors.

On June 5, 1996, Gray Line and Polynesian entered into an agreement for the purchase of Gray Line's authority to provide services as a common carrier by motor vehicle in the

over-twenty-five passenger classifications on the islands of Hawaiʻi, Maui, and Kauaʻi. On the same day, Gray Line and RDH entered into an agreement for the purchase of Gray Line's authority to provide services as a common carrier by motor vehicle in the one-to-seven and eight-to-twenty-five passenger classifications on the island of Oʻahu. On June 19, 1996, Gray Line and Aloha–State entered into an agreement for the purchase of Gray Line's authority to provide services as a common carrier by motor vehicle in the one-to-seven and eight-to-twenty-five passenger classifications on the islands of Hawaiʻi, Maui, and Kauaʻi.

On June 26, 1996, Gray Line and Polynesian filed an application with the PUC for approval to bifurcate that portion of Gray Line's CPCN authorizing it to operate in the over-twenty-five passenger classification on the islands of Hawaiʻi, Maui, and Kauaʻi and to transfer that operating authority to Polynesian. On the same day, Gray Line and RDH filed an application with the PUC for approval to bifurcate that portion of Gray Line's CPCN authorizing it to operate in the one-to-seven, eight-to-twenty-five, and over-twenty-five passenger classifications on the island of Oʻahu and to transfer that operating authority to RDH. On July 3, 1996, Gray Line and Aloha–State filed an application with the PUC for approval to bifurcate that portion of Gray Line's CPCN authorizing it to operate in the one-to-seven and eight-to-twenty-five passenger classifications on the islands of Hawaiʻi, Maui, and Kauaʻi and to transfer that operating authority to Aloha–State.

Also on July 3, 1996, Gray Line filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Hawaiʻi.

der consolidating Nos. 21839, 21915, and 21916, Jack's filed an "opening brief," and Robert's filed an opening brief jointly with PHT, THH, THK, THM, and THO as appellants. Robert's, PHT, THH, THK, THM, and THO's opening brief and an amended opening brief were stricken by this court. Thus, only the points of error raised in Robert's, PHT, THH, THK, THM and THO's second amended opening brief need to be consid-

ered. See HRAP Rule 28(b) (1999) ("[T]he appellant shall file an opening brief containing the following sections.... (4) A concise statement of the points of error set forth in separately numbered paragraphs.... Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.").

B. *Intervention In The PUC's Proceedings And Temporary Transfer Of Operating Authority*

On July 15, 1996, THH, THK, and THM moved to intervene in the PUC proceeding regarding the Polynesian transfer, and THO and PHT moved to intervene in the PUC proceeding regarding the RDH transfer. On August 6, 1996, THH, THK, and THM moved to intervene in the PUC proceeding regarding the Aloha–State transfer. On August 7, 1996, Robert's, PHT, and Jack's Tours, Inc. (Jack's) moved to intervene in the PUC proceeding regarding the Polynesian transfer, and Robert's moved to intervene in the PUC proceedings regarding the RDH and Aloha–State transfers.

On August 23, 1996, the Bankruptcy Court approved the sale of Gray Line's operating authority to Polynesian, RDH, and Aloha–State pursuant to their respective purchase agreements.

On August 30, 1996, the PUC granted temporary approvals for Polynesian to operate in the over-twenty-five passenger classification on the islands of Hawaiʻi, Kauaʻi, and Maui, and for RDH to operate in the one-to-seven, eight-to-twenty-five, and over-twenty-five passenger classifications on the island of Oʻahu. Polynesian and RDH commenced operations pursuant to these temporary approvals shortly after they had been granted.

C. *Proceedings Regarding Permanent Transfer Of Gray Line's CPCN To Aloha–State, Polynesian, And RDH*

On September 9, 1996, the PUC granted THH, THK, and THM's joint motion to intervene and Jack's, PHT's, Robert's, and THO's individual motions to intervene. Jack's, PHT, Robert's, THH, THK, THM, and THO are hereinafter collectively referred to as "the intervernors."

On December 9, 1996, the PUC issued prehearing order No. 15221, which identified the following issues to be considered in deciding whether Gray Line's application for the Aloha–State transfer should be granted:

1. Whether the proposed transfer will be consistent with the public interest under the provisions of HRS §§ 271–18 and 271–1 [ (1993) [2]].

2. HRS § 271–18 provides in relevant part:

**Transfer of certificates of public convenience and necessity, contract carrier permits, and carrier property.**

....

(b) No motor carrier shall sell, lease, assign, mortgage, or otherwise dispose of, or encumber the whole or any part of its property necessary or useful in the performance of transportation services for the public or any [CPCN] or permit; nor shall any motor carrier, by any means, directly or indirectly, merge or consolidate its property, certificates of public convenience and necessity or permits, or any part thereof, with any other carrier, without first having secured from the [PUC] an order authorizing it so to do. Every such sale, lease, assignment, mortgage, disposition, encumbrance, merger, or consolidation, made other than in accordance with the order of the commission authorizing the same is void.

....

(d) Whenever a transaction is proposed under subsection (b) ... of this section, the motor carrier or motor carriers, or person or persons, seeking approval thereof shall present an application to the commission in such form as the commission may require and the commission may thereupon act upon the application with or without first holding a public hearing; provided that if requested, it shall afford reasonable opportunity for interested parties to be heard. If the commission finds that subject to such terms and conditions as it shall find to be just and reasonable the proposed transaction will be consistent with the public interests, the commission shall enter an order approving and authorizing the transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable. In passing upon any transaction under subsection (b) ..., the commission shall give weight, among other considerations, to the effect of the proposed transaction upon (1) adequate transportation service to the public, (2) other motor carriers, and (3) the employees of any transferring motor carrier.

HRS § 271–1 provides in relevant part:

**Declaration of policy.** The legislature of this State recognizes and declares that the transportation of persons and of property, for commercial purposes, over the public highways of this State constitutes a business affected with the public interest. It is intended by this chapter to provide for fair and impartial regulation of such transportation in the interest of preserving for the public the full benefit and use of the highways consistent with the public safety and the needs of commerce; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers, to encourage the establishment and maintenance of reasonable rates and charges for transporta-

2. Whether the proposed transfer will be consistent with the provision of adequate transportation service to the public.

3. Whether the long-term effect of the proposed transfer will substantially prejudice the existing motor carriers under HRS §§ 271–18 and 271–1[, *see supra* note 2].

4. Whether the long-term effect of the proposed transfer will be beneficial to the employees of Gray Line.

5. Whether the proposed transfer is consistent with the public interest and transportation policy of the State of Hawai['ji and will foster sound economic conditions in transportation among the several carriers as set forth in the declaration of policy in HRS § 271–1[, *see supra* note 2,] as amended.

6. Whether [Aloha–State] has presented sufficient facts to show its fitness and ability to meet the requirements for the proposed services on the islands of Hawai['ji, Maui, and Kaua['ji, including the financial fitness to provide the services as proposed in the application.

On December 10, 1996, the PUC issued prehearing order No. 15226, which identified six issues substantially identical to those identified above, to be considered in deciding whether Gray Line's application for the Polynesian transfer should be granted. However, it also included an additional issue, namely, "5. Whether the proposed transfer is or is not required by the present or future public convenience." On December 12, 1996, the PUC issued prehearing order No. 15234, which identified substantially the same issues as those identified above, to be considered in deciding whether the Gray Line's application for the RDH transfer should be granted.

On December 23, 1996, Robert's filed motions for reconsideration of orders No. 15221 and 15226. On December 24, 1996, Robert's filed a motion for reconsideration of order No. 15234. In support of all three motions for reconsideration, Robert's alleged that the PUC erred in failing to include as issues "the dormant status of [Gray Line's CPCN]" and "the public need and necessity for the proposed services."

On January 2, 1997, the PUC issued order No. 15289, which amended prehearing order No. 15226 "to exclude an issue (issue no. 5) regarding the public convenience for the service."

On January 13, 1997, THH, THK, and THM filed a motion for reconsideration of order No. 15289. On February 25, 1997, the PUC issued order No. 15380 denying Robert's motion for reconsideration of order No. 15226 and THH, THK, and THM's motion for reconsideration of order No. 15289, concluding that the movants failed to show why public need and necessity must be proved when the discontinuance of the transferor motor carrier's service was for a period of less than six months prior to the filing of the transfer application. On February 28, 1996, the PUC issued order No. 15394, denying Robert's motion for reconsideration of order No. 15234, and order No. 15395, denying Robert's motion for reconsideration of order No. 15221, citing the same reasons.[3]

Following extensive discovery, the PUC conducted hearings regarding the Aloha–State transfer on September 15 and 16, 1997, the RDH transfer on December 1 and 2, 1997, and the Polynesian transfer on December 9 and 10, 1997. On July 1, 1998, the PUC issued its decision and order No. 16399 regarding the Aloha–State transfer. On July 20, 1998, the PUC issued its decision and order No. 16422 regarding the RDH transfer and its decision and order No. 16423 regarding the Polynesian transfer. In all three decisions and orders, the PUC concluded

---

tion and related accessory service, without unjust discrimination, undue preference or advantage, or unfair or destructive competitive practices. This chapter shall be administered and enforced with a view to carrying out the above declaration of policy.

3. On March 24, 1996, Robert's filed notices of appeal to this court from orders Nos. 15380, 15394, and 15395, which resulted in appeals Nos. 20720, 20729, and 20730. This court dismissed the appeals in Nos. 20720, 20729, and 20730 for lack of jurisdiction, holding that the orders appealed from were neither final orders ending the proceeding nor preliminary rulings of the nature that deferral of review pending entry of a final decision would deny the appellant adequate relief.

that: (1) the proposed transfers were consistent with the public interest and the present and future provision of adequate transportation service, inasmuch as the replacement of Gray Line with the respective transferees would maintain a reasonable level of competition and choice to the public; (2) the proposed transfers did not substantially prejudice existing motor carriers and would foster sound economic conditions in transportation among the several carriers, inasmuch as (a) the transferee carriers had failed to show any negative effect that they might suffer directly attributable to the transfer and (b) their investment, undertaken in order to serve former Gray Line customers, was a business decision carrying no guarantee of continued business from those customers; (3) the proposed transfers would benefit rather than prejudice former Gray Line employees inasmuch as the proceeds from the sale of Gray Lines's operating authority would be added to the funds available to pay the bankruptcy claims against Gray Line, which included the claims of former employees; and (4) the respective transferees were fit and able to meet the requirements for the proposed services, including the financial fitness to provide the services as proposed by the respective applications. The PUC approved Gray Line's applications to bifurcate its CPCN and to transfer its authority to operate as a common carrier by motor vehicle in the one-to-seven and eight-to-twenty-five passenger classifications on the islands of Hawai'i, Kaua'i, and Maui to Aloha–State, in the over-twenty-five passenger classification on the islands of Hawai'i, Kaua'i, and Maui to Polynesian, and in the one-to-seven, eight-to-twenty-five, and over-twenty-five passenger classifications on the island of O'ahu to RDH.

On July 13, 1998, Robert's filed a motion for reconsideration of decision and order No. 16393. The PUC denied Robert's motion in its order No. 16433, filed on July 23, 1998. On August 3, 1998, Robert's, PHT, and THO filed a joint motion for reconsideration of decision and order No. 16422, and, on the

same day, Robert's, PHT, THH, THK, and THM filed a joint motion for reconsideration of decision and order No. 16423. The PUC denied the Robert's, PHT's, and THO's joint motion and Robert's, PHT, THH, THK, and THM's joint motion in its order Nos. 16477 and 16470, respectively, filed on August 24, 1998.

Robert's filed a notice of appeal of decision and order No. 16399 and order No. 16433 on August 24, 1998. Robert's, PHT, and THO filed a notice of appeal of decision and order Nos. 16422 and 16477 on September 18, 1998. On the same day, Robert's, PHT, THH, THK, and THM filed a notice of appeal of decision and order Nos. 16423 and 16470.

The notices of appeal regarding the PUC's orders denying the appellant's motions for rehearing were timely inasmuch as they were filed within thirty days after entry of those orders. The timeliness of the filing of the notices of appeal as to the original decision and order Nos. 16399, 16422, and 16423 is questionable, inasmuch as the notices of appeal were filed more than thirty days after the respective orders had been entered and no applicable statutory provision or rule of court appears to extend that time. However, we need not decide whether decision and order Nos. 16399, 16422, and 16423 are properly included in this appeal because, in view of HRS § 271–32(b) (1993),[4] all issues to be considered on appeal are set forth in the respective motions for reconsideration, the denials of which have been properly appealed.

## II. STANDARD OF REVIEW

■■■ An appeal from a final order of the [PUC] is taken to the Supreme Court of Hawai'i. [HRS § 269–15.5 (Supp.1998), HRS § 271–32(e) (1993), HRS § 271–33 (1993), HRS § 271G–24 (1993).] The applicable standard of review is established by HRS § 91–14(g) (1993), which provides:

4. HRS § 271–32(b) provides in relevant part:
 The motion for reconsideration or a rehearing shall be filed within ten days after the decision and order has been served and shall set forth specifically the ground or grounds on

 which the applicant considers the decision or order to be unlawful. No person shall in any court urge or rely on any ground not so set forth in the motion.

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of its discretion is reviewable under subsection (6). *Smith v. State, Dep't of Labor & Indus. Relations,* 80 Hawai'i 150, 153, 907 P.2d 101, 104 (1995).

Accordingly, a reviewing court will reverse an agency's findings of fact if it concludes that such a finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. HRS § 91–14(g)(5). On the other hand, the agency's conclusions of law are freely reviewable. *Amfac, Inc. v. Waikiki Beachcomber Investment Co.,* 74 Haw. 85, [119], 839 P.2d 10, [28], *reconsideration denied,* 74 Haw. [650], 843 P.2d 144 (1992).

*Sussel v. Civil Service Comm'n of the City and County of Honolulu,* 74 Haw. 599, 610, 851 P.2d 311, 317 (1993). We further recognize that:

It is the [PUC] that is authorized to fix "just and reasonable" rates to be charged by public utilities, HRS § 269–16, [as well as issue CPCNs with respect to common carriers by motor vehicle, HRS § 271–12(a) (1993), and permit sales or transfers of such CPCNs, HRS § 271–18(b) (1993),] and a reviewing court is not empowered to examine the case *de novo.* In order to preserve the function of the administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." An agency's findings, if supported by reliable, probative and substantial evidence, will be upheld.

*In re Kaanapali Water Corp.,* 5 Haw.App. 71, 77–78, 678 P.2d 584, 589 (1984) (quotation omitted).

*In re Application of Puhi Sewer & Water Co., Inc.,* 83 Hawai'i 132, 136–37, 925 P.2d 302, 306–07 (1996) (brackets added; ellipsis points omitted.)

Additionally, courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field. *In re Application of Hawai'i Electric Light Co.,* 60 Haw. [625,] 629, 594 P.2d [612,] 617 [ (1979) ].

*In re Application of Hawaiian Elec. Co., Inc.,* 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996).

### III. DISCUSSION

A. *The PUC Did Not Err In Excluding The Issue Whether Public Convenience And Necessity Required The Transfer Of Gray Line's CPCN.*

1. *Statutory provisions governing the issuance of CPCNs*

■ The intervenors argue that the PUC did not apply the appropriate standard in

deciding whether to grant the application to transfer Gray Line's CPCN to Aloha–State, Polynesian, and RDH. They contend that the "dormancy" doctrine required the PUC to treat the transfers at issue as a grant of new CPCNs rather than a transfer of existing CPCNs from one motor carrier to another.

The standards applicable to the PUC's review of an application for issuance of a new CPCN are provided in HRS § 271–12(c) (1993):

> Subject to section 271–15 [ (dealing with duplicative operating authority) ], a [CPCN] shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to this chapter and the requirements, rules, and regulations of the commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise the application shall be denied.

The standards applicable to the PUC's review of applications for transfer of existing CPCNs are provided in HRS § 271–18(d) (*see supra* note 2). The intervenors argue that the provision of HRS § 271–12(c) that proposed service be required by "public convenience and necessity" is more stringent than the provision of HRS § 271–18(d) that the proposed transaction be consistent with "public interest." They claim that the PUC's approval of the transfers of its CPCN should be reversed and the matter remanded to the PUC for consideration of the issue of "public convenience and necessity."

This court has never before addressed the relationship between HRS §§ 271–12(c) and 271–18(d). In *In re Application of Charley's Tour & Transportation, Inc.,* 55 Haw. 463, 522 P.2d 1272 (1974), this court construed the "public convenience and necessity" requirement as follows:

> The burden is on the applicant to show that the proposed operation not only will

be of beneficial value to the community, but also is a necessity. Generally, the applicant may meet this burden by demonstrating either a lack of adequate existing facilities to presently serve the public, or insufficient facilities to meet anticipated future demands for service.

*Id.* at 469, 522 P.2d at 1277 (citation omitted).

In the present matter, the PUC did not consider the adequacy of the existing carriers' service or the sufficiency of their facilities to meet anticipated future demand and did not make any findings in that respect. Consequently, it has not been established that Gray Line's application met the "public convenience and necessity" standard of HRS § 271–12(c).

The question, then, is whether Gray Line, Aloha–State, Polynesian, and RDH were required to meet such a standard. The answer to this question depends on whether HRS § 271–12(c) applies to the transactions proposed by Gray Line, or, as urged by the intervenors, the "public convenience and necessity" standard must be used in applying HRS § 271–18(d) under the circumstances of this case, pursuant to the "dormancy" doctrine and the related "new service" doctrine.

### 2. The "dormancy" and "new services" doctrines

This section outlines the scope, rationale, and application of the dormancy doctrine as developed in the federal and state case law.

#### a. *Federal case law*

■ Dormancy is a doctrine in accordance with which a transportation authority that has not been used may not be transferred if the transfer would result in new service to an area already adequately served by existing carriers. *Minnesota Transp. Regulation Bd. v. United States,* 966 F.2d 335, 338 n. 3 (8th Cir.1992).

> Dormancy is a concept the [Interstate Commerce] Commission [ (ICC) ] developed in the course of its statutory oversight[5] of the transfer of operating rights. The underlying premise is that if a selling

---

**5.** The Interstate Commerce Act of 1887, as amended by the Transportation Act of 1940,

Pub.L. No. 76–785, 54 Stat. 899 (1940), provided in relevant part:

carrier's activity has become minimal or nonexistent, the area's shippers are presumed already to be receiving adequate service from other carriers, who will have adjusted their own operations to meet these needs. *See Gregg Cartage & Storage Co. v. United States,* 316 U.S. 74, 83, 62 S.Ct. 932, 86 L.Ed. 1283 (1942). A purchaser of dormant rights is seen as aggressively seeking to expand the vendor's relinquished business, *C & H Transportation Co.—Purchase (Portion)—Ferguson Trucking Co.,* 93 M.C.C. 741 (1964), thus inciting a struggle among carriers in the area with damage either to "the public interest or to intervening or protesting carriers who conducted operations during the interruption of said services," *Arrow Transp. Co. v. United States,* 300 F.Supp. 813, 818 (D.R.I.1969).

*Wright Trucking, Inc. v. United States,* 403 F.Supp. 119, 120 (D.Mass.1975) (footnote omitted).

> If the [ICC] finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) [ (which included sale and purchase of a motor carrier's operating rights) ] and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable.

49 U.S.C. § 5(2)(b) (1976).

Pursuant to its authority under the Interstate Commerce Act to approve transactions involving transfer of operating rights of motor carriers, the ICC promulgated the following regulation reflecting dormancy considerations:

> The mere cessation of operations by the holder of an operating right shall not be deemed to require denial of the proposed transfer of such right. If, however, a cessation of operations has occurred, which fact shall be stated in the application, and operations have not been conducted under the considered rights for a substantial period of time, the proposed transfer will be denied unless the holder shows that such discontinuance was caused by circumstances over which he had no control. The [ICC] may require, in an appropriate case, proof of the nature and extent of operations conducted under the operating right for a period of 6 months preceding the date of the request for such evidence.

49 C.F.R. § 1132.5(b) (1970).

The Revised Interstate Commerce Act of 1978, Pub.L. No. 95–473, 92 Stat. 1337 (1978), replaced section 5(2)(b) of the Interstate Com-

Dormancy is an idea firmly rooted in the well-developed common law of the ICC. It is analogous to the equitable doctrine of delay in association with laches, sleeping or sitting on one's rights to the detriment of another, estoppel by conduct, and the familiar idea of inducing the reliance of another as a basis for liability in contract and, in some extenuated circumstances, even in tort.

*Atkinson Lines, Inc. v. United States,* 381 F.Supp. 39, 41 (S.D.Ohio 1974).

■ The "new service" doctrine is closely related to the dormancy doctrine and is often asserted in conjunction with it.

Roughly stated, the "new service" doctrine requires that where the evidence shows that a transfer would create new services, either by expansion of old services or by revival of dormant rights, the [ICC] must make an independent determination that

merce Act with different provisions, codified under 49 U.S.C. §§ 10926 and 11343 (1988) and generally reflecting a preference for decreased federal regulation. Responding to these changes, the ICC ruled that:

> Dormancy and its effect on the transferability of operating rights is no longer an issue considered in resolving applications filed pursuant to 49 U.S.C. 10926(1).... The intent of Congress in enacting section 10926 of 49 U.S.C. was to provide a means whereby transfers could be effected easily and without delay under such rules as the [ICC] deemed appropriate. Operating rights under this section should be freely transferred so long as the public interest is not harmed[.]

*American Tank Transport, Inc.—Purchase(Portion)—Second Service System, Inc.,* 127 M.C.C. 485, 486 (1979). *See also Minnesota Transp. Regulation Bd.,* 966 F.2d 335 (8th Cir.1992) (in a state transportation regulation board appeal of the ICC's decision to exempt from regulation a transaction between two motor carries involving a transfer of operating rights, the Eighth Circuit held that the dormancy issue was properly excluded from consideration as irrelevant).

The ICC itself was abolished and replaced with the Surface Transportation Board by the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803 (1995). The same legislation eliminated the successor statutes of section 5(2)(b), including section 10926, from title 49 of the U.S.C. However, HRS § 271–18 is reminiscent of the original section 5(2)(b) of the federal Interstate Commerce Act, and therefore the case law interpreting the federal regulatory regime prior to deregulation is relevant to the present matter.

such services are required by public convenience and necessity. In [a] § 5 [ (of the Interstate Commerce Act, *see supra* note 5) ] hearing[,] the burden of proof to show no new services is on the transferee, but the decision as to convenience and necessity is addressed to the sound discretion of the [ICC]. *See, e.g. Tose, Inc. v. United States,* 304 F.Supp. 894 (E.D.Penn.1969). *Bradley v. United States,* 322 F.Supp. 369, 374 (D.Alaska 1971).

### b. *State case law*

A number of state court decisions have addressed the appropriate criteria to be applied in considering an application for transfer of an operating permit when it is alleged that the operating rights have become dormant. In some of these cases, a statute expressly governed the dormancy issue. *See, e.g., Fisher v. Branscum,* 243 Ark. 516, 420 S.W.2d 882 (1967) (Arkansas statute prohibited transfer of CPCN when reasonably continuous service had not been rendered under authority granted by the certificate prior to application); *Austin Tupler Trucking, Inc. v. Hawkins,* 377 So.2d 679 (Fla. 1979) (under Florida statute, when regulatory agency found that CPCN had been dormant for six months or more, it was required to deny application to transfer certificate); *Cooper v. Commerce Comm'n,* 49 Ill.App.3d 398, 7 Ill.Dec. 235, 364 N.E.2d 396 (1977) (under Illinois statute, dormant service could not be transferred without showing of public need); *Matlack, Inc. v. Public Service Comm'n,* 260 La. 359, 256 So.2d 118 (1971) (Louisiana statute prohibited transfer of CPCN unless carrier exercised all rights under certificate for period of six consecutive months immediately prior to transfer); *Massachusetts Furniture and Piano Movers Ass'n v. Department of Public Utilities,* 350 Mass. 563, 215 N.E.2d 769 (1966) (Massachusetts statute precluded transfer of CPCN except in connection with bona fide sale to transferee of business of transferor); *Herman Bros., Inc. v. Spector Industries, Inc.,* 209 Neb. 513, 308 N.W.2d 720 (1981) (Nebraska statute required that when approval of transfer of operating authority was sought and issue of dormancy was properly raised, regulatory agency was required to determine

both fact of dormancy and whether transfer was required by public convenience and necessity); *AA Oilfield Service, Inc. v. State Corp. Comm'n,* 118 N.M. 273, 881 P.2d 18 (1994) (under New Mexico statute, when carrier did not use its operating certificate for four months prior to filing of its initial transfer application, question of dormancy that would preclude approval of the certificate's transfer was one of fact to be decided by regulatory agency on case-by-case basis); *Utilities Comm'n v. Estes Express Lines,* 33 N.C.App. 174, 234 S.E.2d 624 (1977) (under North Carolina statute, regulatory agency had discretion to determine whether franchise could not be transferred because of dormancy).

In jurisdictions where the applicable statutes have not expressly enumerated dormancy as a criterion, but, like HRS § 271–18(d), have only required that a proposed transfer of operating authority be consistent with the public interest, some courts have permitted dormancy to be considered by the regulatory agency in deciding whether to approve the transfer, but have not considered it to be outcome-dispositive in itself. Thus, the Alabama Supreme Court, has approved the Alabama Public Service Commission's policy of disallowing transfers of dormant CPCNs unless good cause is shown for a such transfer, but has looked to additional factors in deciding whether the agency's decision should be sustained. *Ross Neely Express, Inc. v. Public Service Comm'n,* 431 So.2d 1214 (Ala. 1983); *Public Service Comm'n v. B & B Transp. and Limousine Service, Inc.,* 417 So.2d 169 (Ala.1982); *Floyd & Beasley Transfer Co. v. Public Service Comm'n,* 276 Ala. 130, 159 So.2d 833 (1964).

Other state courts construing similar statutes have held that the regulatory agency could not base its decision denying a transfer of an operating permit on dormancy considerations. *See, e.g., Beaufort Transfer Co. v. Public Service Comm'n,* 593 S.W.2d 241 (Mo. App.1979) (Public Service Commission was not required to determine if CPCN had been dormant prior to authorizing transfer of the operating authority when statute governing such transfers did not contain any reference to question of dormancy); *Public Service*

Comm'n v. Vegas Rock & Sand, Inc., 108 Nev. 613, 836 P.2d 630, (1992) (when only restriction on transfer of CPCN in relevant statute was "public interest," regulatory agency's determination that CPCN had been dormant was not enough to justify restricting transfer of certificate absent sufficient showing of harm to other carriers).

Thus, absent statutory provisions expressly addressing dormancy, state courts have not required the applicable regulatory agencies to incorporate dormancy considerations into their decisions.

### 3. Applicability of the dormancy doctrine to the present matter

#### a. HRS § 271–18(d) does not incorporate the dormancy doctrine.

■ In the present matter, the PUC expressly declined to address dormancy or "public convenience and necessity" as issues in the proceedings regarding Gray Line's transfer applications. Inasmuch as HRS ch. 271 contains no provisions regarding dormancy, and "public convenience and necessity" is not a prerequisite to transfer of CPCNs pursuant to HRS § 271–18(d), see supra note 2, the PUC was not required to permit the intervenors to argue these issues. Our view in this respect is consistent with the case law of other jurisdictions, see supra section III. A.2.b.

Furthermore, the PUC's decision to exclude the dormancy issue from the proceedings did not prejudice the intervenors, see infra section III.A.3.c. They were, in fact, allowed to present all relevant arguments and, in fact, received a fair hearing.

■ In reviewing the decisions of administrative bodies, this court is committed to a policy of judicial self-restraint and will not interfere with their interpretations of statutory provisions when they have acted within the ambit of the duties delegated to them by the legislature, unless their findings evince arbitrariness and a disregard of the substantial rights of the parties to the controversy. See Government Employees Ins. Co. v. Hyman, 90 Hawai'i 1, 5, 975 P.2d 211, 216 (1999) (citing Richard v. Metcalf, 82 Hawai'i 249, 921 P.2d 169 (1996)); International Bhd. of

Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citing Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984) and 2 K. Davis, Administrative Law Treatise § 7.22, at 105–06 (2d. ed.1979)); Herrett Trucking Co., Inc. v. Public Service Comm'n, 61 Wash.2d 234, 377 P.2d 871, 877 (1963). The PUC acted within its statutory authority, and its actions were not characterized by arbitrariness or an abuse of discretion in excluding the dormancy issue from the proceedings. Consequently, the PUC's decision is affirmed.

#### b. The dormancy doctrine does not implicate HRS § 271–12(c) in the present matter.

■ The PUC declined to engage in dormancy analysis based upon its conclusion that Gray Line's service "ha[d] not been dormant for a significant period of time." The PUC did, however, suggest that the need and necessity for the services proposed by the transferee might be an issue, pursuant to HRS § 271–12(c), see supra section III.A.1, if a transferor's service had been discontinued for at least six months before the transfer application was filed, citing Bradley, supra. The reference to the six-month period was apparently made because of the provisions of 49 C.F.R. § 1132.5(b), see supra note 7, cited and interpreted in the Bradley decision.

It should be noted that the federal regulation and case law do not suggest that dormancy of a CPCN for six months is a prerequisite to triggering the analysis of the need and necessity of the service. In fact, the federal decisions stress that dormancy is determined by a flexible standard, "so as to be able to assess the facts peculiar to individual cases" "in light of surrounding circumstances." Rogers Cartage Co. v. Interstate Commerce Comm'n, 595 F.2d 379, 382 (7th Cir.1979); see also Arrow Transportation, 300 F.Supp. at 817; cf. Gregg Cartage & Storage, 316 U.S. at 83, 62 S.Ct. 932 (interpreting statute requiring motor carrier to maintain continuous bona fide operation until hearing by ICC, Court observed that cessation of operations for sixty-nine days estab-

lished that there was substantial interruption of service tending to result in expansion of other facilities to meet continuing needs of shippers, and, thus, to cause overcrowding if suspended service were resumed). Consequently, the six-month period is not a bright line cutoff for purposes of dormancy analysis, but, rather, is a relevant factor to be considered. The PUC impliedly recognized, by its reference to *Bradley*, that the application of dormancy analysis might be necessary under certain circumstances.

The PUC did not elaborate upon its conclusion that Gray Line's transportation authority "ha[d] not been dormant for a significant period" beyond the remark that it had been inactive for less than six months. However, we note that other jurisdictions have invoked an exception to the application of the dormancy doctrine when the carrier's failure to operate is due to circumstances beyond its control, including insolvency and bankruptcy. *See, e.g.,* 49 C.F.R. § 1132.5(b) (1970); *Bradley,* 322 F.Supp. at 373; *Carta–Back, Inc. v. Commerce Comm'n,* 64 Ill.App.3d 370, 21 Ill.Dec. 97, 381 N.E.2d 32, 35 (1978); *S.A. Harris Transfer & Storage, Inc. v. Public Service Comm'n,* 240 La. 1059, 127 So.2d 148, 150 (1961). That Gray Line ceased its operations because of financial and other internal problems,[6] immediately initiated negotiations to transfer its CPCN, and entered bankruptcy shortly thereafter are circumstances mitigating against the application of the dormancy doctrine in the present matter. This is not a case of a motor carrier failing to use its operating authority, thereby "sleeping or sitting on [its] rights to the detriment of another." *Atkinson,* 381 F.Supp. at 41. Accordingly, the PUC did not err in declining to apply the standards of HRS § 271–12(c) to the present matter.

c. *HRS § 271–1 did not require the PUC to address the dormancy doctrine in the Gray Line proceedings.*

 The intervenors stress that, within twenty-four hours of the closing of Gray Line's operations, and through and including

the present time, (a) other carriers were and have been providing service to Gray Line's former customers, (b) they did so without complaint, (c) they undertook substantial investments to meet the long-term demand anticipated as a result of Gray Line's closing, and (d) they had sufficient capacity to timely meet the present and future demands of the public for motor coach services. They argue that the policy considerations embodied in HRS § 271–1, *see supra* note 2, such as the promotion of safe and efficient transportation services and the prevention of unfair and destructive competition or unjust advantage within the transportation industry, require that the dormancy doctrine be applied to Gray Line's transfer application.

While the [ICC] must take into account the effects of the transfer on competition, there is no right *per se* to be protected from new entrants into the shipping business. In *Lang Transportation Co. v. United States,* 75 F.Supp. 915 (S.D.Cal. 1948), the court held that the [ICC] has discretion to grant operating rights despite a finding that existing carriers were adequately equipped, willing and able to serve the needs of all shippers. *See also, Carolina Freight Carriers Corp. v. United States,* 297 F.Supp. 848 (W.D.N.C.1969); *A.L. Root Transportation Co. v. United States,* [280 F.Supp. 152 (D.Vt.1968) ]; *Alexandria, Barcroft & Wash. Transit Co. v. United States,* 103 F.Supp. 607 (E.D.Va. 1951); *Norfolk Southern Bus Corp. v. United States,* 96 F.Supp. 756 (E.D.Va. 1950), *aff'd,* 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590 (1950); *Inland Motor Freight v. United States,* 36 F.Supp. 885 (D.Idaho 1941).

*Bradley,* 322 F.Supp. at 374.

The foregoing observations apply equally to the PUC's decisions in the present matter. The PUC determined that allowing Aloha–State, Polynesian, and RDH to replace Gray Line in the respective relevant markets would best serve the present and future interests of the traveling public. In making this determination, the PUC "has broad dis-

---

6. The testimony of Gray Line's president, Nobuhiro Shinohara, reflects that Gray Line closed its operations after the lessor of Gray Line's

motor coaches informed him, on March 17, 1996, that it was going to repossess the busses the following day.

cretionary powers and 'expertise for divination of future needs.' " *Id.* (quoting *Younger Bros., Inc. v. United States,* 238 F.Supp. 859, 860 (S.D.Tex.1965)).

Although the PUC did not expressly address "public need and necessity" for the proposed transfers in the course of the Gray Line proceedings, it did consider the effect of the proposed transfers on the existing carriers, as well as on the public interest. In doing so, it effectively faced concerns underlying the dormancy doctrine, namely, "inducing the detriment of another," *Atkinson,* 381 F.Supp. at 41, and "damages either to the public interest or to intervening or protesting carriers who conducted operations during the interruption of [abandoned or terminated] services." *Arrow,* 300 F.Supp. at 818.

Based upon substantial evidence adduced by all parties to the proceedings, the PUC concluded that the motor carriers that conducted operations during the interruption of the Gray Line's service did not unfairly suffer adverse effects detrimental to the provision of adequate transportation services to the public, *see infra* section III.B. Consequently, in accordance with HRS § 271–1, the PUC did, in fact, address any damage sustained by the intervenors or the public by virtue of Gray Line not having utilized its CPCN for several months following its termination of operations. The intervenors were neither precluded from adducing evidence regarding issues material to their complaints that they were harmed by the resumption of services pursuant to Gray Line's CPCN and that the public had been harmed by the same nor from arguing these issues before the PUC. We hold that the PUC has adequately addressed the public policy considerations of HRS § 271–1.

4. *Applicability of the new services doctrine to the present matter*

■ The intervenors cite *Tose, Inc. v. United States,* 304 F.Supp. 894 (E.D.Pa. 1969), for the proposition that, when a carrier terminates its services to the public, the transferee carrier seeking to assume the transferor's CPCN must first meet the requirements of HRS § 271–12, *see supra* section III.A.1. However, operating rights for services that have been terminated may, in general, be transferred pursuant to HRS § 271–18, *see supra* note 2. The transfer may be disallowed when it would not be consistent with the public interest or the declaration of the state's transportation policy set forth in HRS § 271–1, *see supra* note 2.

The new service doctrine is an extension of the dormancy doctrine. Inasmuch as the PUC did not err in concluding that Gray Line's application did not implicate the dormancy concerns and the record contains no evidence that new services were being contemplated by the transferee motor carriers of Gray Line's CPCN, the new services doctrine is inapposite to the present matter. HRS § 271–12 would only be implicated if Gray Line's CPCN were not transferable due to its dormancy and the issuance of the requested CPCNs to Aloha–State, Polynesian, and RDH were, in effect, the issuance of CPCNs for a new service. Under those circumstances, a showing of "public need and necessity" for the service would be required pursuant to HRS § 271–12.

As discussed *supra* in section III.A.3, the PUC acted within its prerogatives in treating the Gray Line's application as a request to permit Aloha–State, Polynesian, and RDH to continue Gray Line's existing service. In doing so, the PUC considered the public interest factors required by the provisions of HRS §§ 271–18 and 271–1, as reflected in the issues it ordered considered in connection with each of the Gray Line's applications. Consequently, as previously stated, HRS § 271–12 and the new service doctrine are inapposite to this case.

B. *Evidence Supporting The PUC's Decisions*

The intervenors note that HRS § 91–10(5) (1993) [7] provides that the applicants in a pro-

---

7. HRS § 91–10(5) provides that:
 Except as otherwise provided by law, the party initiating the proceeding shall have the burden of proof, including the burden of pro-

ducing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence.

ceeding before the PUC have the burden of presenting substantial evidence to support their position. They contend that Gray Line, Aloha–State, Polynesian, and RDH failed to carry that burden. The PUC's FOFs are reviewed for clear error and, "if supported by reliable, probative and substantial evidence, will be upheld." *In re Application of Puhi Sewer & Water Co.*, 83 Hawai‘i at 137, 925 P.2d at 307.

### 1. *Public interest*

■ The intervenors argue that the PUC erroneously found that the replacement of Gray Line by Aloha–State, Polynesian, and RDH would be in the public interest by: (1) maintaining the level of competition that existed when Gray Line was in the market; (2) maintaining choice for the public; and (3) ensuring the provision of adequate transportation services. The intervenors' primary argument appears to be that there was no evidence on which these findings could be founded. They also assert (1) that the transfer of Gray Line's CPCN to Aloha–State, Polynesian, and RDH would result in rate increases to the detriment of the public, (2) that the replacement of Gray Line with its proposed transferees would entail a change in the "status quo," and (3) that the addition of carriers into the market would (a) result in cost-cutting that would compromise safety and quality due to increased competition and (b) make regulatory oversight more difficult.

The PUC's findings are supported by the record. The only evidence cited by the intervenors in support of their contention that the transfer of Gray Line's CPCN would result in motor carrier rate increases was testimony that there was no rate increase in 1997, which was attributable, in part, to the fact that Gray Line's revenue shifted to the other carriers. However, the same evidence reflects that rate increases during the three years preceding 1997 were due, at least in part, to losses sustained by Gray Line. There was no evidence that the proposed transferees of Gray Line's CPCN would be sustaining losses or that the denial of the proposed transfers of Gray Line's CPCN

would render future rate increases less probable.

While it is true that replacing a money-losing carrier with a profitable carrier alters the status quo in the market, the PUC was justified in concluding that the change would advance the public interest. Certainly, the denial of the transfer applications would alter the status quo existing before Gray Line's demise no less than approval of the transfers.

Finally, the arguments that increased competition would lead to cost-cutting, thereby compromising safety and quality, could be made whenever new entrants are allowed into a regulated market. The counterargument, which the PUC expressly articulated, is that, without the transfers, the choices to the traveling public and the incentives for the remaining carriers to maintain and improve their services would be reduced.

The PUC did not clearly err in concluding that the transfer of Gray Line's operating authority under its CPCN to Aloha–State, Polynesian, and RDH would be in the public interest.

### 2. *Harm to the intervenors*

■ The intervenors argue that the PUC erroneously found that there was no evidence that approval of the transfer would directly cause them to lose business in the long run, or that future losses might not be caused by other factors, such as normal competitive forces or changes in the tourism market. The intervenors' argument relates in large part to the alleged withholding of information by Gray Line, Aloha–State, Polynesian, and RDH, which prevented the intervenors from adequately assessing the impact of the proposed transfers.[8] In addition, Jack's cites: (1) certain investments that it claims it made in the wake of Gray Line's closure, the recoupment of which would be threatened if the proposed transfers of Gray Line's CPCN were approved; (2)(a) two customer accounts it allegedly lost to Aloha–State and Polynesian, (b) the business it received from Aloha–State and Polynesian in the past, which it expects to lose in the event of the proposed transfer, and (c) projected loss of revenue;

8. However, no specific decisions of the PUC relating to discovery are being appealed.

and (3) loss of personnel, inasmuch as some of Jack's employees on the island of Hawai'i have left to work for Polynesian.

While it is uncontradicted that the intervenors have lost some customers to Aloha–State, Polynesian, and RDH, there is also evidence that some of these customers may have been dissatisfied with the intervenors' service. Likewise, there is no evidence in the record that the personnel losses complained of by Jack's, which hired some of Gray Line's former employees and added fifty to one hundred new employees after the PUC granted temporary operating authority to Polynesian and RDH, were not caused by normal personnel movements rather than excessive competition from the carriers approved by the PUC. Jack's asserted loss of investment is contradicted by the fact that much of the investment was undertaken *after* Polynesian had begun operating under the temporary permit.

The PUC's findings are supported by the record, and it was not clearly erroneous for the PUC to find that the approval of the proposed transfers would not directly cause the intervenors loss of business in the long term.

### 3. *Benefit to former Gray Line employees*

■ The intervenors argue that the PUC erroneously found that the approval of the transfer would benefit the former employees of Gray Line in the long term.

The PUC based its findings regarding the effect on Gray Line's former employees of the proposed transfers on the fact that the proceeds from the sale of Gray Line's CPCN would be added to Gray Line's bankruptcy estate, thereby increasing the possibility that the employees' claims against Gray Line for unpaid wages, salaries, and commissions would be paid.

While the intervenors argue that, because they had hired a number of former Gray Line employees, these employees would be detrimentally affected if the intervenors experienced a negative impact on their business due to the proposed transfer, the record likewise reflects that Aloha–State, Polyne-

sian, and RDH hired former Gray Line employees and/or would provide former Gray Line employees with employment opportunities. Thus, any diminution in employment opportunities due to the intervenors' loss of business to Aloha–State, Polynesian, and RDH would presumably be offset by increased employment opportunities with these latter carriers.

The PUC did not commit a clear error in finding that the approval of the Gray Line's applications would benefit the former employees of Gray Line in the long term.

### 4. *Financial fitness and ability to render services*

■ The intervenors argue that the PUC erroneously found that Aloha–State, Polynesian, and RDH were financially fit and able to render the services proposed in their applications. They argue that the information provided by Aloha–State, Polynesian, and RDH was insufficient to support the required finding of financial fitness and ability to perform.

The PUC based its finding of financial fitness and ability to render services on: (1) Aloha–State's efficiency and the profitability of its then-current operations; (2) Aloha–State's total equity, including sufficient liquidity to meet maturing short term obligations; (3) Aloha–State's available line of credit from Central Pacific Bank to finance the proposed expansion; (4) Aloha–State's projected revenue increase over 1997 revenues, which was consistent with the increase achieved from 1996 to 1997; (5) RDH's operating profitability and growing equity; (6) the facts that RDH (a) had the support of its sister company, Paradise Cruise, Ltd. (PCL), in the form of leased vehicles, personnel support, and significant business expertise, and (b) that PCL was the source of most of RDH's business; (7) RDH's approved line of credit from First Hawaiian Bank; (8) Polynesian's improved operational results over five years, as demonstrated by positive cash flows; (9) the fact that Polynesian did not need to borrow additional money for working capital purposes, despite having an available line of credit; and (10) Polynesian's improved operating ratios for each island in 1997 after

receiving temporary authority to operate in the over-twenty-five passenger classification.

The foregoing findings are supported by substantial evidence in the record, and it was not clearly erroneous for the PUC to find that Aloha–State, Polynesian, and RDH were financially fit and able to meet the requirements for the proposed services.

Accordingly, the intervenors' arguments that the PUC orders were not supported by sufficient evidence fail.

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the PUC's orders.